ADAMS, J.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY GARNER, et al., | ) | CASE NO.  1:02CV1286 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | JUDGE JOHN R. ADAMS |
| v. | ) | |
| | ) | ORDER |
| CUYAHOGA COUNTY JUVENILE | ) | [RESOLVING DOCS. 246, 252, and 263] |
| COURT, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## I. INTRODUCTION

This action is before the Court upon the Motion for Award of Attorney's Fees and Costs under

42 U.S.C. § 1988 (Doc. 246) of defendants Joseph F. Russo, Administrative Judge of the Cuyahoga

County Juvenile Court;  Kenneth J. Lusnia, Court Administrator; Len Munks, Superintendent; Angelo

Lardomita; and Donna Coe, kna Apanasewicz.  This action is also before the Court upon defendants'

Motion for Attorney's Fees and Sanctions for Frivolous Conduct under Ohio Rev. Code § 2323.51

(Doc. 252).  Furthermore, this action is before the Court upon defendants' Motion for Attorney's Fees

as Sanctions under Rule 11, 28 U.S.C. 1927, and this Court's Inherent Authority (Doc. 263).

Defendants request $730,871.10 in attorney's fees[1] (including compensation for costs of law clerks) for

---

[1]As a threshold matter, the Court will use "attorney's fees," over "attorney fees,"
"attorneys fees," or "attorneys' fees," except where quoting other authorities. *See Stallworth v.
Greater Cleveland Regional Transit Authority*, 105 F.3d 252, 253 n. 1 (6th Cir. 1997).

defending the lawsuit,[2] plus such fees incurred for pursuing the motions for costs and fees, and interest. In seeking attorney's fees and costs, the defendants contend that the case at bar was frivolous, unreasonable or lacking foundation.  The Court has considered the memoranda in support and the exhibits attached thereto, the Amended Memorandum in Opposition (Doc. 271), the record, and the oral arguments of counsel offered during the hearing held on May 20, 2005.[3]  For the reasons that follow, the Court holds that the defendants are entitled to attorney's fees upon the grounds that most of the claims of plaintiffs Anthony Garner, Bruce Richardson, Vanessa Brown, Tiffanie Dennis, Shelley Isom, Rayshunn Lilly, Patricia McNear, Monique Moore, Spencer Bellamy, and Thomas Washington were frivolous, unreasonable, and without foundation, and that the plaintiffs should have dismissed these claims, at the latest, after discovery had shown that they were without evidentiary support.  The Court will award attorney's fees in favor of defendants and against plaintiffs and imposes joint and several liability for that award upon their attorneys, Merrie Frost and Timothy A. Ita, as a sanction.

## II. BACKGROUND

On June 3, 2002, plaintiffs Anthony Garner and Tiffanie Dennis, by and through counsel,[4] filed a six-count complaint in the Cuyahoga County, Ohio Common Pleas Court

---

[2]This amount does not include attorney's fees generated by the representation of defendants by the Cuyahoga County Prosecutor's Office.

[3]At the hearing, the Court considered only whether the defendants have met their burden to show that costs, fees, and/or sanctions should be awarded. *See* Order (Doc. 265) at 2.

[4]Timothy A. Ita of R. Jack Clapp and Associates Co., L.P.A. signed the complaint as counsel for plaintiffs.  On September 11, 2002 (after the case was removed to this Court), Merrie Frost entered her appearance as co-counsel for plaintiffs in the case at bar (Doc. 9). Therefore, the plaintiffs are represented by Attorneys Frost and Ita.

(Case No. CV-02-472242) against the following seven defendants:  Joseph F. Russo, Administrative Judge of the Cuyahoga County Juvenile Court; Kenneth J. Lusnia, Court Administrator; Len Munks, Superintendent; Angelo Lardomita; Al David; Harold Mazzarins; and Richard Drost.  On July 3, 2002, the defendants removed the above-entitled case to this Court based on federal question jurisdiction.[5]

On June 19, 2002, plaintiffs Paula Roberson, Shelley Isom, Nathaniel Prather, Patricia McNear, Terrance Jenkins, Sonja Colwell,[6] and Heather McCollough, by and through counsel,[7] filed a three-count complaint in the Cuyahoga County Common Pleas Court (Case No. CV-02-473509) against the same seven defendants, as well as Jimmy Dimora, County Commissioner.  On July 10, 2002, the defendants removed the case to this Court on the basis of federal question jurisdiction, being Case No. 1:02CV1327.[8]

---

[5]The case was assigned to the docket of United States District Judge Kathleen M. O'Malley.  On February 27, 2003, the case was reassigned to the docket of the undersigned. *See* Order (Doc. 63).

[6]On September 2, 2005, a voluntary petition for relief in a case under Title 11 of the United States Code (the "Bankruptcy Code") was filed by plaintiff Sonja Colwell in the United States Bankruptcy Court for the Northern District of Ohio, being Case No. 05-23427. Pursuant to 11 U.S.C. § 362, the filing of such a case under the Bankruptcy Code mandates a stay of the within proceedings against plaintiff Sonja Colwell.  The case shall remain active and pending as to all other parties. *See* Judgment Entry Perpetually Staying Further Proceedings Against Defendant Sonja Colwell Only (Doc. 286).

[7]Merrie Frost of R. Jack Clapp and Associates Co., L.P.A. signed the complaint as counsel for plaintiffs.

[8]The case was assigned to the docket of District Judge O'Malley.

3

On October 1, 2002, plaintiffs Thomas Washington, Kevin Wesley, Spencer Bellamy, Monique Moore, and Bruce Richardson, by and through counsel,[9] filed a three-count complaint in the Cuyahoga County Common Pleas Court (Case No. CV-02-482900) against the following three defendants:  Joseph F. Russo, Administrative Judge of the Cuyahoga County Juvenile Court; Kenneth J. Lusnia, Court Administrator; and Len Munks, Superintendent.  On October 22, 2002, the defendants removed the case to this Court based on federal question jurisdiction, being Case No. 1:02CV2094.[10]

On November 7, 2002, the Court granted plaintiffs' Motion for Leave to File Amended Complaint and dismissed without prejudice Case Nos. 1:02CV1327 and 1:02CV2094. *See* Order (Doc. 15).  That same day, Attorney Frost filed an Amended Complaint (Doc. 16) in the case at bar. Fifteen plaintiffs (the original plaintiffs in each of the three cases plus new party plaintiff Rayshunn Lilly) were named in this pleading.  The Amended Complaint asserted six-counts and named the following nine defendants:  Joseph F. Russo, Administrative Judge of the Cuyahoga County Juvenile Court; Kenneth J. Lusnia, Court Administrator; Len Munks, Superintendent; Angelo Lardomita; Al David; Harold Mazzarins; Richard Drost; Donna Coe, kna Apanasewicz; and Jimmy Dimora.

On February 14, 2003, Attorney Frost, with leave of court, filed a Second Amended Complaint (Doc. 48) that set forth three additional causes of action.  Fifteen plaintiffs (the plaintiffs named in the Amended Complaint with the exception of Paula Roberson, plus new party plaintiff

---

[9]Merrie Frost of R. Jack Clapp and Associates Co., L.P.A. also signed this complaint as counsel for plaintiffs.

[10]The case was assigned to the docket of United States District Judge Solomon Oliver, Jr.  On October 23, 2002, the case was reassigned to the docket of District Judge O'Malley.

Vanessa Brown) are named in this pleading. Plaintiffs are certain former and current African-American employees of the Cuyahoga County Juvenile Court ("CCJC"). The Second Amended Complaint asserted nine-counts and named the following ten defendants: Joseph F. Russo, Administrative Judge of the Cuyahoga County Juvenile Court (in his official capacity only);[11] Kenneth J. Lusnia, Court Administrator (individually and in his official capacity); Len Munks, Superintendent (individually and in his official capacity); Angelo Lardomita (individually and in his official capacity); Al David (individually and in his official capacity); Janie Carter (individually and in her official capacity); Richard Drost (individually and in his official capacity); Donna Coe, kna Apanasewicz (individually and in her official capacity); Charvez James (individually and in her official capacity); and Jimmy Dimora (individually and in his official capacity).[12] The Second Amended Complaint averred a number of federal and state claims based on alleged acts of racially-motivated employment discrimination and retaliation. Count I is for discrimination on the basis of race and/or color in violation of Ohio Rev. Code Chapter 4112. Count II is a *Greeley* wrongful discharge claim.[13] Count III is a claim of racially-charged employment discrimination and deprivation of equal protection rights, enforced through 42 U.S.C. § 1983. Count IV is an intentional infliction of emotional distress claim. Count V is a claim for retaliation. Count VI

---

[11]The CCJC itself is not a party to this action. *See* Doc. 123 at 3 n. 1.

[12]On February 25, 2003 (11 days after the Second Amended Complaint was filed), plaintiffs dismissed the case without prejudice as to new party defendants Janie Carter and Charvez James. *See* Notice of Dismissal (Doc. 59). The eight defendants that remained are Caucasian CCJC officials and supervisors.

[13]In Ohio, common law claims of wrongful discharge in violation of "public policy" were created for at-will employees by the case of *Greeley v. Miami Valley Maint. Contractors, Inc.*, 49 Ohio St.3d 228 (1990).

5

alleges that liability for the alleged misconduct be imposed against the CCJC under a theory of *respondeat superior*. Count VII is for civil conspiracy. Count VIII is for civil aiding and abetting. Count IX is a claim for punitive damages. While the Second Amended Complaint avers each cause of action on behalf of each plaintiff, discovery revealed that each cause of action is not cognizable to each plaintiff.

A.      *Attorneys Frost and Ita and the Law Firms*

As previously stated, when the case at bar was filed in Cuyahoga County Common Pleas Court, only Attorney Ita signed the complaint as counsel for plaintiffs. A review of the Case Management/Electronic Case Files (CM/ECF) docket sheet for the case reveals that Attorney Ita had set-up his user account and has received e-mail notification in the instant case throughout the proceedings. On September 11, 2002, after the case had been removed to Federal court, Merrie Frost entered her appearance as co-counsel for plaintiffs (Doc. 9) .

Plaintiffs' Motion for Continuance of the Case Management Hearing (Doc.67), filed on March 12, 2003, provides in pertinent part: "Both of plaintiffs attorneys have previously scheduled depositions, on different cases, for [March 23, 2003]." With respect to defendants' Motion for Partial Judgment on the Pleadings (Doc. 116), Attorney Frost stated that "Tim Ita and I both discussed that particular one, and he agreed, too, that on part of it they were right, and we went ahead with it." Transcript of May 20, 2005 Hearing (Doc. 279) at 31. So, at least as of July 24, 2003 (when plaintiffs' response to the motion (Doc. 122) was filed), Attorney Ita was still active as counsel for plaintiffs in the case at bar.

6

Plaintiffs' Motion for Leave to Take One Additional Deposition (Doc. 134) , filed on September 10, 2003, is the last document on which the names of Attorney Ita and R. Jack Clapp and Associates Co., L.P.A. appear.  Attorney Ita and the law firm never sought leave of court to withdraw.  *See* Local Rule 83.9, added to the Local Rules on June 5, 2000 (attorney may not withdraw without first providing written notice to the client and all other parties and obtaining leave of Court).

On October 7, 2003, Attorney Frost filed plaintiffs' Memorandum in Opposition to Defendants' Motions for Summary Judgment (Doc. 153).  Only her name and address are listed in the signature block.  The memorandum was filed manually "due to the fact that plaintiffs' counsel just started at a new law firm." Plaintiffs' Notice to Court (Doc. 154).

On October 16, 2003, Attorney Frost filed plaintiffs' Memorandum in Opposition to Defendants' Motion to Strike (Doc. 171).  The law firm name of Patterson & Frost appears on the document.  Plaintiffs' Reply to Defendants' Opposition to Sanctions and Third Motion for Sanctions (Doc. 275), filed on May 16, 2005, also lists the name of this law firm.

On July 13, 2005, Attorney Frost submitted a Notice (Doc. 280) of a change of address to the Clerk upon the change in her business address.

B.      *Dispositive Motion Practice*

Defendants requested an order from the Court allowing an extension of the page limitation to 75 pages for dispositive motions. *See* Doc. 125.  They subsequently modified the request to 50 pages for each motion. *See* Doc. 131 at 3-4 and Doc. 132.  On September 10, 2003, the Court denied the request by marginal entry order ( Doc. 133).  At the Status Conference held on August 5, 2003, the parties were instructed to comply with the page limitation set forth in Judge O'Malley's Order

7

(Doc. 12) setting a limit of 30 pages per dispositive motion.

At the December 30, 2003 Pretrial Conference, the plaintiffs were given leave by the Court to file an additional memorandum in opposition to defendants' motions for summary judgment limited to 30 pages.[14]  On January 20, 2004, the plaintiffs did file an 18-page Supplemental Memorandum (Doc. 193).  Plaintiffs were never limited in the amount of evidence they could timely submit in opposition to the motions for summary judgment.   No page restriction had ever been placed on evidentiary materials.  On March 25, 2004, the Court denied by marginal entry order plaintiffs' Motion for Leave to Include Additional Evidentiary Materials (Doc. 186), which had been filed on December 31, 2003.  Plaintiffs had requested leave to allow them to update the affidavits and exhibits.  The marginal entry order provided that "Plaintiffs may not now [*i.e.*, December 2003] supplement their Opposition with additional evidentiary materials; the deadline for supplementation has long expired." *See* Doc. 204; *see also* Transcript of May 20, 2005 Hearing (Doc. 279) at 21-23.

C.      *Comprehensive Position Questionnaires ("CPQs")*

In 1996, the CCJC engaged David M. Griffith and Associates, now MAXIMUS, Inc. ("Maximus") to effectuate a "Position Evaluation Process."  The purpose of the job audit process was to develop a wage and salary plan that was internally equitable and externally competitive with other courts.

_____

[14]"Appendices of evidentiary, statutory or other materials are excluded from these page limitations." Local Rule 7.1(f).

The process designed by Maximus required each employee to fill out a CPQ for each job classification.  The CPQs then were used to modify pay, title, job grade, and requirements for each position.

At the time the defendants filed their motions for summary judgment, a total of 169 individual CPQs had been submitted for Maximus's evaluation.  Of the African-American employees who submitted CPQs, 93.8% received a position upgrade, 2.1% received a title change without a position upgrade, and 3.1% received neither, as their essential job functions had not changed.  Of the Caucasian employees who submitted CPQs, only 70.1% received a position upgrade, 10.4% received a change in title without a position upgrade, and 13.4% received neither.  Between January 1, 1998 and August 27, 2003, the CCJC promoted 147 employees, including 84 (57.1%) African-Americans, 56 (38.1%) Caucasians, and 7 (4.8%) employees of other races.  Therefore, the evidence on record overwhelmingly indicates that more African-American employees than Caucasian employees had benefitted from the CPQ process.

As of the date the Court granted summary judgment on their claims, plaintiffs Dennis and Prather had never submitted a CPQ for position reevaluation.  Plaintiff Isom received an upgrade in pay increasing her annual salary by $4,739 as a result of the initial phase of the CPQ process.  On April 30, 2003,  McNear (and 38 other Magistrate Clerks) received an upgrade to Case Management Clerk and an increase of $1,705.60 in annual salary, as well as a retroactive payment in the amount of

9

$1,567.84 to make the salary effective May 21, 2002.[15]  Plaintiff Moore was retained as a part-time

Detention Officer after 26 positions were eliminated.  She also received an hourly pay increase from

$9.71 to $11.75 as a result of the CPQ procedure.

In March, 2003, plaintiffs' counsel requested a CPQ of Raymond Walker, which

counsel was told "did not exist."  However, that document was subsequently found. Doc. 134 at 3;

*see also* Transcript of May 20, 2005 Hearing (Doc. 279) at 20.

During a telephone status conference held on April 24, 2003, the Court ordered that the

defendants had 21 days from April 25, 2003, to produce the historical salary data requested by the

plaintiffs. *See* Minutes (Doc. 86).  The CPQs were included in the over 18,000 pages of documents

produced by the defendants.

The Report of Parties' Planning Meeting (Doc. 11) provides in pertinent part:  "Plaintiff

anticipates hiring an expert statistician to look at the relationship between race and employees' pay

rates and promotions.  This expert (or possible two separate experts) will speak to both liability and

damages." *Id.* at 2.  However, no expert was retained by the plaintiffs. Transcript of May 20, 2005

Hearing (Doc. 279) at 19.  As a result of the plaintiffs placing the entire process at issue, as well as the

results of job audits conducted by Maximus, it was necessary for the defendants to obtain an expert

review and opinion of the process in order to defend against the disparate impact claims alleged by the

plaintiffs.  Defendants did file the expert report of James Battigaglia (Doc. 114).

---

[15]The CPQ had been faxed to Maximus on June 7, 2002. *See* Transcript of May 20,
2005 Hearing (Doc. 279) at 21.

D.     *Summary Judgment Orders*

The Court previously granted summary judgment in favor of the five remaining defendants on all of the plaintiffs' claims that were pending at the time of the decisions. *See* Docs. 208-217, 219, and 241-243.[16]  There is indeed little, if any, evidentiary support for any of those claims in this record, and no reasonably prudent attorney, having performed an ongoing investigation, would have filed or continued prosecuting those claims.  The Court found that plaintiffs Garner, Richardson, Brown, Dennis, Isom, Jenkins, and Lilly failed to provide <u>any</u> evidence and plaintiffs Jenkins, McCollough, McNear, Colwell, and Prather failed to provide <u>sufficient</u> evidence to support any of their federal or state claims premised upon alleged acts of race discrimination and retaliation.  The Court also found that plaintiffs Moore, Bellamy, and Washington failed to provide <u>any</u> evidence to support their claims of race discrimination and retaliation brought under Ohio Rev. Code § 4112.02, *et seq.*, and for wrongful discharge in violation of public policy.

---

[16]On April 7, 2005, the plaintiffs filed a Notice of Appeal (Doc. 262) challenging the grant of summary judgment in favor of the defendants on all of the claims of all plaintiffs who had not been voluntarily dismissed from the case (Case No. 05-3476).  On August 15, 2005, the Court of Appeals for the Sixth Circuit granted appellant Ray Lilly's motion to dismiss him only as a party to the appeal.

1.    Disparate Treatment Discrimination

The disparate treatment claims of plaintiffs Garner, Richardson, Brown, Dennis, Isom, Jenkins,[17] Lilly, McCollough,[18] McNear, Colwell,[19] Prather,[20] Moore, Bellamy, and Washington failed because they did not prove a *prima facie* case of race discrimination. With regard to his termination, Garner did not provide any evidence that he was replaced by a non-protected individual. McCollough failed to identify any of the defendants as individuals who unfairly denied her promotions. At the very least, personal liability should not have been pursued against the defendants in their individual capacities for decisions related to McCollough in which they played no part.

Plaintiff Richardson's claim that he suffered several adverse employment actions effected by defendant Lardomita was frivolous. Richardson averred that Lardomita subjected him to adverse employment actions when he: (1) yelled at Richardson and threatened him in March 1999; (2) asked Richardson to respond to emergency calls while on vacation; (3) requested an investigation of plaintiff Brown; (4) left Richardson off a distribution list for an e-mail sent to all Unit Managers; (5) failed to invite Richardson to play golf or to go to Las Vegas; and (6) failed to provide Richardson with a larger office. Sixth Circuit case law is abundantly clear that none of Richardson's complaints rose to the level of a materially adverse employment action. Moreover, Richardson could not show that he was unfairly

---

[17] Excepting the CCJC's failure to appoint him to a Unit Manager position in 1999.

[18] Excepting her claims that she was unfairly denied the positions of Community Diversion Program Coordinator and Sheltercare Coordinator.

[19] Excepting her claim that she was unfairly denied the position of Sheltercare Coordinator.

[20] Excepting his claim that he was unfairly denied the position of Compliance Officer.

12

denied the promotion to Drug Coordinator in favor of a similarly-situated, non-protected individual in 1999 because the job was awarded to an (protected) African-American.  Furthermore, Richardson admitted that he had no interaction with Judge Russo and never notified him of any allegations of discrimination, harassment, and/or retaliation. R. to Int. 22 propounded by Judge Russo.

Plaintiff Brown's complaint that she was wrongfully accused of watching nude male juvenile residents in the shower on February 13, 2002, in violation of the CCJC's policy, also lacked merit.  To begin, Brown admitted in her deposition that she had been aware of the CCJC's policy regarding opposite sex supervision since her hiring and that she committed the infraction.  Furthermore, Brown was not disciplined as a result of the shower incident, and she suffered no other materially adverse consequence in connection therewith.

Plaintiffs Brown, Jenkins, McCollough, McNear, Colwell, and Prather also failed to present even a scintilla of evidence that they had been unfairly denied positions in favor of a similarly-situated, non-protected CCJC employee.  Their allegations that Caucasian CCJC employees received positions improperly were based solely on speculation and inadmissible hearsay.  The unrefuted record evidence also demonstrated that the Caucasian employees were awarded properly advertised jobs for which Brown and Jenkins did not even apply, and for which McCollough and McNear had no proof that they qualified.  Incredibly, this allegation was made by Brown despite the fact that she had not applied for any other positions during her tenure at the CCJC as of the date the Court granted summary judgment on her claims.

Lastly, Brown, Isom, Jenkins, and McNear did not provide any proof of racial animus associated with Human Resource's act of waiving the minimum job qualifications for Ann Berichon

13

(a Caucasian) as a favor to Judge Russo and his bailiff, Berichon's father.  Neither Brown nor any of the other plaintiffs applied for Berichon's Assistant Admission Screening Officer position.

Plaintiff Dennis lacked evidence that she was treated differently from any similarly-situated, non-protected employee with respect to the jewelry incident or the leave dispute.  Dennis admitted that she was unaware of any other incident involving missing property on her shift.  Similarly, Dennis admitted that she was unaware of another situation in which any supervisor's signature was in question on a request-for-leave form.  Moreover, Dennis provided no admissible, non-hearsay evidence to support her allegation that she was unfairly denied, or prevented from applying for, available jobs in favor of similarly-situated, non-protected employees.

Plaintiff Isom failed to prove a *prima facie* case of disparate treatment discrimination with respect to her complaints:  (1) that a Caucasian employee should have received discipline for removing a child from isolation without consulting her; (2) that the CCJC hired a Caucasian woman for the Activities Assistant job; and (3) based on the defendants' failure to hire her for the positions of either Lead Detention Officer or Detention Services Coordinator.  Isom did not provide evidence tending to prove that she and the first Caucasian employee at issue were similarly-situated with respect to all of the requirements for finding two individuals to be similarly-situated in a disciplinary context.  In fact, Isom and Prather had never been disciplined as of the date the Court granted summary judgment to the defendants on the disparate treatment claims.  Isom did not establish that she was qualified for the Activities Assistant job position or that she was similarly-situated to the Caucasian woman who ultimately was hired for the position.  Finally, the Lead Detention Officer and Detention Services Coordinator jobs were awarded to (protected) African-Americans.

Given the fact that Isom was one of the 93.8% of African-American employees that received an upgrade in pay increasing her annual salary, her claim that she had suffered an adverse employment action as the result of "not getting a CPQ for more money and title changes like [certain Caucasian employees]" also lacked merit.

Plaintiff Jenkins failed to prove a *prima facie* case of discrimination with respect to his claim that racial animus motivated either the CCJC's abolishment of the Shift Supervisor position, the subsequent failure to award him one of seven Unit Manager jobs,[21] or his demotion to Detention Officer.  Jenkins, McCollough, and Prather also could not prove a *prima facie* case of discrimination with respect to their temporary classification in early 2002 as exempt employees under the Fair Labor Standards Act as it pertained to overtime pay.  Furthermore, Jenkins lacked evidence from which a reasonable jury could find that the CCJC's articulated nondiscriminatory reason for rejecting him in favor of Julia Chessler (a Caucasian) for the Unit Manager position in 1999 (that she was more qualified) was merely pretextual, and that it had actually acted for discriminatory reasons.  Moreover, Jenkins could not show that he was unfairly denied the promotion to Acting Assistant Superintendent in favor of a similarly-situated, non-protected individual in 2001 because the job was awarded to an (protected) African-American.  Jenkins also failed to prove a *prima facie* case of discrimination with respect to the CCJC's rejection of him for the Community Diversion Program Coordinator position in 2002 because he did not establish that he was qualified for the position.

---

[21]None of the defendants even participated in the decision to reject Jenkins for the Unit Manager job.

15

Plaintiff Lilly could not show that he was rejected for the Probation Officer position in favor of a similarly-situated, non-protected individual because the job was awarded to an (protected) African-American.  Similarly, with respect to the two disciplinary actions, Lilly did not show that he was treated less favorably than any similarly-situated CCJC employee.  Even if Lilly was similarly-situated to non-protected individuals with respect to the second disciplinary action, his receipt of a written warning for violation of court policy did not rise to the level of a materially adverse employment action.  Likewise, Lilly's claim that he received low performance evaluations because he is black was wholly unsupported by the evidence.  In fact, his last four evaluations (dated June 2000, September 2000, July 2001, and July 2002) indicated that his work performance met or exceeded expectations.  Finally, to the extent that Lilly claimed unfair treatment due to the defendants' making him move to different posts, he failed to allege an adverse employment action.

Plaintiff McCollough could not show that she was denied either the Juvenile Rights Advocate position, Probation Officer position in 2000, one of four Probation Officer positions in 1999, Intake Officer position, Social Worker position in 1997,[22] Assistant Bailiff position, Intake Mediator position, or Intensive Probation Officer position in favor of a similarly-situated, non-protected person.  The

---

[22]Likewise, McCollough could not establish a *prima facie* case on the ground that the CCJC denied a second application she "believed" she submitted for a Social Worker post. *See* Ex. 731, McCollough Depo. at 177.  McCollough testified in her deposition that she does not know when she submitted the second application.  In the absence of such knowledge, McCollough could not provide even a scintilla of evidence that she was rejected in favor of a similarly-situated, non-protected individual.  A subsequently filed affidavit appeared to contradict this deposition testimony.  In her affidavit, McCollough indicated that she was in fact denied the position in favor of non-protected employees. *See* Doc. 154.  The Court, however, did not consider the contradictory testimony set forth in the affidavit. *See* Doc. 215 at 18 n. 9.

16

Juvenile Rights Advocate position had not been filled as of the date the Court granted summary judgment due to the provisions of a stay entered by a state court in separate litigation.  The Probation Officer position in 2000, two of the Probation Officer positions in 1999, Intake Officer position, and Social Worker position in 1997 were each awarded to (protected) African-Americans.  Even if McCollough could have recalled when she applied for the Assistant Bailiff position, the discriminatory intent necessary for a disparate treatment claim with respect to that job could not be attributed to the defendants under any set of facts because hiring decisions with respect to those positions are within the discretion of individual judges.  Although McCollough averred that she applied for the Intake Mediator position, she did not remember when she applied, could not prove that she was qualified for the position, and provided no evidence to show who was hired for the job in her stead.  Moreover, McCollough could not prove that she was qualified for the position because she did not remember the job's posted qualifications.  Similarly, McCollough provided no evidence to show who was hired for the Intensive Probation Officer job in 1993.[23]

Defendants' reasons for hiring Heather Union, rather than McCollough, for the Community Diversion Program Coordinator position in 2002 were that she received better ratings from the interviewers, had more relevant experience attributable to her serving as acting Community Diversion Program Coordinator, and was more qualified than McCollough.  Defendants' reason for hiring Craig Bruehler, instead of McCollough or Colwell, for the Sheltercare Coordinator position in 1999 was that

---

[23]It is beyond cavil that any discrimination claim related to the denial of her application for this position is barred by a two-year statute of limitations for § 1983 claims and a six-year statute of limitations for Ohio Rev. Code Chap. 4112 claims.

Bruehler was more qualified for the job by virtue of his superior experience in community service and probation.  McCollough lacked evidence from which a reasonable jury could find that the CCJC's articulated nondiscriminatory reasons for rejecting her application in favor of Union and for hiring Bruehler were merely pretextual, and that it had actually acted for discriminatory reasons.  Similarly, Colwell failed to show that the defendants' legitimate, nondiscriminatory reason for rejecting her in favor of Bruehler was pretext for discrimination.  In fact, McCollough admitted that she did not know if she was more qualified than Bruehler and that she was not the most qualified applicant for the job. Defendant Lardomita's alleged comment that former Court Administrator John Zachariah "sent the white boy over to get the job" was inapposite in the absence of evidence that Lardomita participated in the decision to reject Colwell in favor of Bruehler.  Furthermore, Lardomita's alleged comment is inadmissible hearsay.

With respect to the verbal reprimand McCollough received in 2001, she did not show that she was treated less favorably than any similarly-situated CCJC employee.  The reprimand, as well as the August 2002 work performance evaluation, also did not constitute a materially adverse employment action.  McCollough provided no proof that either the verbal reprimand or the evaluation resulted in any change in the terms and conditions of her employment.

McCollough's disparate treatment claim likewise failed insofar as it was premised upon her complaint that she was selected for drug testing in May 2001.  Her claim that defendants Lardomita and Coe targeted her for testing was pure speculation and wholly unsupported by the record evidence.

With respect to the disciplinary actions taken against her for excessive tardiness, plaintiff McNear did not offer any evidence tending to prove any of the requirements for finding two individuals

18

to be similarly-situated in a disciplinary context.  Moreover, none of the actions taken against McNear constituted a materially adverse employment action.  Furthermore, the claims of McNear and Colwell that it was "unfair" that Detention Center employees were required to punch a time clock were entirely without merit because all Detention Center employees, minority and non-minority alike, were required to use a time clock.

McNear also failed to prove a *prima facie* case with respect to her claim that she was discriminated against in connection with the CPQ upgrade from Magistrate Clerk to Case Management Clerk.  She was not treated differently from any similarly-situated, non-protected employee in regard to this claim.  McNear and Colwell were also not treated differently with respect to their claim that they were not allowed to train for overtime work in the admission screening department.  Moreover, the defendants did not cause McNear to suffer an adverse employment action in connection with the upgrade.[24]

Plaintiff Colwell could not show that she was denied either the Assistant Bailiff position, Courtroom Coordinator position, one of eight Admission Screening Officer positions, or Detention

---

[24]The apparent attempt of plaintiffs Garner, McCollough, McNear, Colwell, and Prather to prove a pattern and practice of discrimination by citing a laundry list of allegedly discriminatory acts was also unsuccessful.

Services Coordinator position in favor of a similarly-situated, non-protected individual.[25]  For the reasons previously stated, Colwell could not prove the discriminatory intent necessary for a disparate treatment claim with respect to the Assistant Bailiff position.  The Courtroom Coordinator position, six of the Admission Screening Officer positions, and the Detention Services Coordinator position were each awarded to (protected) African-Americans.  Moreover, she could not prove that she was qualified for the Detention Services Coordinator position.

Colwell's allegation that defendant Lardomita used Detention Center surveillance cameras to spy on her and others did not support a *prima facie* case of discrimination.  She also failed to prove a *prima facie* case of discrimination with respect to her claims that she was unfairly disciplined for the Annette Wallace incident or the holding room situation involving Alan Scott.  She could not show that she was treated less favorably than any similarly-situated CCJC employee.  Moreover, Colwell did not suffer an adverse employment action in connection with either of these incidents or for taking security keys home in November 2002.  She was not disciplined for the incidents.  She also did not suffer a materially adverse change in the terms and conditions of her employment in connection with her claim that Lardomita and certain of her African-American colleagues were no longer friendly toward her.  The 2002 job performance evaluation also did not constitute a materially adverse employment action.  Colwell's complaint regarding the use of personal time to attend to matters related to the case at bar was meritless because she was not treated differently from any similarly-situated, non-protected

---

[25]No disparate treatment claim was available to Colwell with respect to the Lead Detention Officer position because she declined defendant Lardomita's solicitation to apply for it.

employee under the leave policy.  Her complaint regarding the CCJC's intention to increase Unit Managers' duties was also entirely meritless.  Among other things, Colwell did not identify an adverse employment action in connection with the purported reorganization.  Colwell also did not suffer an adverse employment action due to the prohibition against eating lunch in McNear's office adjacent to a Magistrate's courtroom.

To the extent that Colwell claimed discrimination based on defendant Munks's failure to punish the individual who left a cartoon near her mailbox, her claim was frivolous.  A thorough investigation failed to reveal the offender who left the cartoon depicting a figure holding a sign that read, "The end of the game is near."  Colwell's belief that Munks never intended to find the culprit is pure speculation and was not evidence that would have allowed her claim to survive summary judgment.  Colwell's claim that Munks discriminated against her by neglecting to punish Charvez James was equally without merit. James received a verbal reprimand for her participation in the December 2002 confrontation with Colwell.

Plaintiff Prather could not prove that he was qualified for the Probation Officer position in 1999. He also could not show that he was denied the Activities Assistant job in favor of a similarly-situated, non-protected person.  The Activities Assistant job was awarded to an (protected) African-American. Prather did not suffer an adverse employment action in regard to: (1) his promotions to Admission Screening Officer and Detention Services Coordinator; (2) his September 2002 complaints about shift coverage issues and a temporary shift change; (3) the failure of the African-American Chief Probation Officer to recommend that he be hired for a Probation Officer position in 2002; or (4) his supervisor's efforts to remedy Prather's repeated failure to remember his key chit.

21

Defendants' reasons for hiring James Legarth (a Caucasian), rather than Prather, for the Compliance Officer position in 2001 were that he was more qualified than Prather and Legarth performed well in his interview in terms of communicating his experience; whereas Prather did not interview well and was unable to articulate why his experience would make him the best candidate for the job.  Prather lacked evidence from which a reasonable jury could find that the CCJC's articulated nondiscriminatory reasons for rejecting him in favor of Legarth were merely pretextual, and that it had actually acted for discriminatory reasons.

With respect to the Placement Officer and Juvenile Rights Advocate positions and the holiday overtime pay, Prather did not show that he was treated less favorably than any similarly-situated, non-protected individual.  The CCJC's failure to award him either position also did not constitute an adverse employment action.  Furthermore, Prather's work performance evaluations did not constitute a materially adverse employment action.  He did not provide a shred of evidence to prove that the evaluations resulted in any change in the terms and conditions of his employment.  In fact, Prather was promoted a second time after an August 2002 evaluation that he characterized as a "travesty" and "pure retaliation."

Prather's complaint that Julia Chessler, his Caucasian supervisor, treated him unfairly is entirely frivolous.  Prather admitted in his deposition that his problems with the supervisor were not based on race, but rather arose from a personal disagreement. Ex. 654, Prather Depo. at 57-58.  Moreover, defendant Munks's handling of the situation did not create an inference of discriminatory animus.  The situation was resolved when, shortly after Munks reviewed Prather's internal complaint, Prather

22

received the promotion to Admission Screening Officer, which removed him from Chessler's chain of command.

Plaintiff Moore's alleged[26] receipt of a verbal reprimand and the finding of insubordination in 1999 did not rise to the level of an adverse employment action.  With respect to the finding of insubordination and the three-day suspension, Moore did not show that a similarly-situated person outside the protected class received more favorable treatment.  She did not identify any instance of preferential treatment of a non-protected person, let alone with the required specificity.  Based on the record evidence, the Court is hard-pressed to identify any discriminatory animus attributable to the defendants.  Moore's subjective unsubstantiated belief that Caucasian employees would have been treated differently was not sufficient to survive summary judgment or to give rise to a constructive discharge claim.

Plaintiff Bellamy's receipt of a reprimand in 1991 also did not rise to the level of an adverse employment action.  With respect to the CCJC's rejection of him for a full-time Detention Officer job in 1997 through 1999, Bellamy did not provide any evidence whatsoever to show that he was denied the position in favor of similarly-situated, non-protected individuals.  Even if a *prima facie* case is arguably demonstrated as to the full-time Detention Officer positions, the claim could not survive because the defendants demonstrated a nondiscriminatory explanation for not rehiring him full-time.  Bellamy pled guilty to attempted theft from the State of Ohio for falsely claiming hours worked at the State of Ohio, Department of Youth Services, when he actually was working at the CCJC.  The CCJC has a

---

[26]The CCJC has no record of a verbal reprimand issued to Moore.

23

legitimate interest in rejecting applicants who are guilty of work-related theft crimes. It was not shown by Bellamy that the defendants' explanation was a pretext or that the decision to not rehire him full-time was motivated by race discrimination.

With respect to the elimination of their part-time Detention Officer positions in 1998 due to a reduction in force, Bellamy and Washington were unable to establish by competent proof that a similarly-situated, non-protected person received preferential treatment. The nine retained part-time positions were awarded to eight African-Americans and one Hispanic, individuals inside the protected class. Based on the record evidence, the Court is hard-pressed to identify any discriminatory animus attributable to the defendants. Finally, Washington's receipt of written reprimands for sleeping on the job and for disobeying an order from a supervisor also did not rise to the level of an adverse employment action.

2.     Disparate Impact Discrimination

The disparate impact claims of plaintiffs Garner, Richardson, Brown, Dennis, Isom, Jenkins, Lilly, McCollough, McNear, Colwell, Prather, Moore, Bellamy, and Washington failed because they did not prove a *prima facie* case of race discrimination.

In written discovery and during his deposition, Garner cited a number of incidents he incorrectly believed supported his claim for disparate impact discrimination. These incidents do not justify a disparate impact analysis because Garner did not identify a specific policy (other than the CPQ process) that allegedly caused a race-based imbalance in the CCJC's workforce. Instead, Garner (as well as Richardson, Brown, Dennis, Isom, Jenkins, Lilly, McCollough, McNear, Colwell, and Prather) merely launched a wide-ranging attack on the CCJC's employment practices by calling to the Court's

24

attention a laundry list of isolated incidents of purported discrimination without providing evidence of their impact upon an entire class of employees.

Plaintiffs Garner, Richardson, Brown, Dennis, Isom, Jenkins, Lilly, McCollough, McNear, Colwell, Prather, Moore, Bellamy, and Washington also did not identify a specific policy, other than the CPQ process, as disparately impacting the CCJC's African-American employees.  They provided no evidence that the CPQ process had resulted in adverse consequences to African-American employees.

Plaintiffs Moore, Bellamy, and Washington likewise could not establish that the CCJC's hiring policies disparately impacted African-Americans.  Of the 630 individuals hired between 1997 and 2003, 360 (57.1%) were African-American, 248 (39.4%) were Caucasian, and 22 (3.5%) were other races.

3.      Hostile Work Environment Discrimination

Plaintiffs Garner, Richardson, Brown, Dennis, Isom, Jenkins, Lilly, McCollough, McNear, Prather, Moore, Bellamy, and Washington also did not prove a *prima facie* case of hostile work environment discrimination because they put forth <u>absolutely no</u> evidence of the type required for such a claim to be sustained; and it was unlikely their counsel could ever produce such evidence.  In fact, Moore was treated favorably because she was retained as a Detention Officer when others were not and received a pay increase as a result of the CPQ process.  The record is devoid of any evidence that

25

Garner, Richardson, Dennis, Jenkins,[27] Lilly, McCollough, McNear, Moore, Bellamy, and Washington

were subject to racial harassment.  Richardson, Lilly, and Moore admitted that none of the defendants

ever used racially derogatory remarks or promulgated any racist policies.[28]  Bellamy and Washington

did not claim that any of the defendants ever used racially derogatory remarks or promulgated any

---

[27]Ex. 399, Jenkins Depo. Ex. 1A, Discovery from Russo, Int. 2, 4; Ex. 400, Jenkins Depo. Ex. 1B, First Jenkins Response to Russo Discovery, Int. 2, 4, and 8; Ex. 402, Jenkins Depo. Ex. 2A, Discovery from Lusnia, Int. 2, 4; Ex. 403, Jenkins Depo. Ex. 2B, First Jenkins Response to Lusnia Discovery, Int. 2, 4, and 10; Ex. 415, Jenkins Depo. Ex. 7A, Discovery from Coe, Int. 2, 4; Ex. 416, Jenkins Depo. Ex. 7B, First Jenkins Response to Coe Discovery, Int. 2, 4, and 10; Ex. 405, Jenkins Depo. Ex. 3A, Discovery from Munks, Int. 2, 4; and Ex. 406, Jenkins Depo. Ex. 3B, First Jenkins Response to Munks Discovery, Int. 2, 4, and 10.

[28]Exs. 525, 528, 531, 534, 536, 538, 540, Richardson Depo. Ex. 2A-8A, Int. 2; Exs. 526, 529, 532, 535, 537, 539, 541, Richardson Depo. Ex. 2B-8B, 1st R. to Int. 2.  Ex. 531, Richardson Depo. Ex. 4A, Int. 10; Ex. 532, Richardson Depo. Ex. 4B, 1st R. to Int. 10; Ex. 538, Richardson Depo. Ex. 7A, Int. 12; Ex. 539, Richardson Depo. Ex. 7B, 1st R. to Int. 12; Ex. 525, Richardson Depo. 2A, Int. 12; Ex. 526, Richardson Depo. Ex. 2B, 1st R. to Int. 12; Ex. 528, Richardson Depo. Ex. 3A, Int. 12; Ex. 529, Richardson Depo. Ex. 3B, 1st R. to Int. 12; Ex. 522, Richardson Depo. Ex. 1A, Int. 10; Ex. 523, Richardson Depo. Ex. 1B, 1st R. to Int. 10.  Exs. 95-100, Lilly Depo. Exs. 1B-1G, Int. 2; Exs. 103-109, Lilly Depo. Exs. 2B-2G, 1st R. to Int. 2.  Ex. 94, Lilly Depo. Ex. 1A, Int. 4; Ex. 102, Lilly Depo. Ex. 2A, 1st R. to Int. 4; Ex. 100, Lilly Depo. Ex. 1G, Int. 3; Ex. 108, Lilly Depo. Ex. 2G, 1st R. to Int. 3; Ex. 95, Lilly Depo. 1B, Int. 6; and Ex. 103, Lilly Depo. Ex. 2B, 1st R. to Int. 6.

racist policies. Brown, Dennis, Isom,[29] and Prather[30] failed to identify a single racial slur or any act of racial harassment directed toward them. Even ignoring the hearsay problem, defendant Lardomita's use of the term "yuz people" is one isolated comment and is not so objectively and subjectively offensive as to give rise to a viable claim of racial harassment by McNear. The only derogatory racial remark on record in the case at bar is Lilly's comment that an African-American Conference Officer, who did not take his side in a disciplinary proceeding, is "an Uncle Tom and he would do exactly what they tell him to do." Ex. 93, Lilly Depo. at 47.

Furthermore, plaintiff Colwell did not prove a *prima facie* case of hostile work environment discrimination because she put forth <u>insufficient</u> evidence to sustain such a claim. Colwell's purported evidence--defendant Lardomita's reference to Craig Bruehler as the "white boy" and to the Lead Detention Officers as "his people," his statement that "you people don't understand, you're not the same grade," Charvez James's alleged threat, and the behavior of Lardomita and certain of Colwell's African-American colleagues in reference to the case at bar--simply was not severe and pervasive

---

[29]Plaintiff Isom's deposition made it clear that she would be unable to adduce evidence to support her original claim. She was asked: "Prior to filing this lawsuit, do you feel that you were harassed on the job in any way?" She responded, "No, I wasn't harassed at all." Ex. 451, Isom Depo. at 112. In fact, Isom explained: "when we used to go to work, I laughed all day. All day from the time I got there to the time I went home. So Pleasant." *Id.* at 304.

[30]Ex. 655, Discovery from Russo to Prather; Ex. 656, First Response to Russo Discovery, Int. 2, 4, and 10, and Request for Admission 5, 2nd IC, 657; Ex. 658, Discovery from Lusnia to Prather; Ex. 659, First Response to Lusnia Discovery, Int. 2, 4, and 8, and Second Response to Request for Admissions 3, 4, and 5, Ex. 660; Ex. 671, Discovery from Coe to Prather, Ex. 672, First Response to Coe Discovery, Int. 2, 4, and 8, and Second Response, Ex. 673, Request for Admissions 3, 4, 5, 6, and 7; Ex. 661, Discovery from Munks to Prather, Ex. 662, First Response to Munks Discovery, Int. 2 and 4, and Request for Second Response, Ex. 663; Ex. 664, Discovery from Lardomita to Prather, Ex. 665, First Response to Lardomita Discovery, Int. 2, 4, 8, 10, 12, and 13.

enough, even when viewed collectively, to create an objectively hostile work environment.  Racial animus cannot be inferred from a handful of allegedly discriminatory comments or actions, especially when it is doubtful that a number of them were at all based on race.

4.    Retaliation

Plaintiffs Garner, Richardson, Brown, Dennis, Isom, Jenkins, Lilly, McCollough,[31] McNear, Colwell, Prather, Moore, Bellamy, and Washington failed to prove a *prima facie* case of retaliation. Jenkins admitted that defendants Judge Russo, Lusnia, Coe, and Munks did not retaliate against him.[32] Garner failed to establish a causal connection between the protected activity and his termination. Richardson did not suffer an adverse employment action and had not engaged in any protected activity that could serve as the basis for a retaliation claim.  Brown did not suffer a materially adverse employment action in being selected for random drug testing.  McCollough did not suffer a materially adverse employment action regarding the August 2002 work performance evaluation.  McNear did not suffer a materially adverse employment action due to:  (1) a physical transfer to a different court building in August 2002; (2) defendant David's demand that she return a key to the Detention Center after she received a promotion and was transferred from the Detention Services department; or (3) the

---

[31]With the possible exception of her claim that she was unfairly denied the Community Diversion Program Coordinator position.

[32]Ex. 399, Jenkins Depo. Ex. 1A, Discovery from Russo, Int. 6 and Ex. 400, Jenkins Depo. Ex. 1B, First Jenkins Response to Russo Discovery, Int. 6; Ex. 402, Jenkins Depo. Ex. 2A, Discovery from Lusnia, Int. 8; Ex. 403, Jenkins Depo. Ex. 2B, First Jenkins Response to Lusnia Discovery, Int. 8; Ex. 415, Jenkins Depo. Ex. 7A, Discovery from Coe, Int. 8; Ex. 416, Jenkins Depo. Ex. 7B, First Jenkins Response to Coe Discovery, Int. 8; and Ex. 405, Jenkins Depo. Ex. 3A, Discovery from Munks, Int. 8; Ex. 406, Jenkins Depo. Ex. 3B, First Jenkins Response to Munks Discovery, Int. 8.

28

prohibition against eating lunch in her office adjacent to a Magistrate's courtroom.  Similarly, Lilly's receipt of a written warning in 2003 did not constitute an adverse employment action as is required to establish a *prima facie* case of retaliation.

Plaintiffs Brown, Isom, McCollough, and Colwell failed to establish a causal connection between the filing of the case at bar and the CCJC's requirement that they use personal time to attend to matters related to the case at bar.  Dennis did not identify any act of retaliation causally linked to her filing with the Equal Employment Opportunity Commission ("EEOC") or the case at bar.

Plaintiff Isom did not offer any proof of a causal connection between the notice she received from defendant Coe regarding her lack of qualifications for the Detention Services Coordinator post and her rejection for the job.  Isom's retaliation claims against defendant Lardomita likewise failed due to a lack of admissible evidence of any materially adverse employment action.  The fact that defendant Munks asked Isom a question about a juvenile without first investigating the matter himself also does not constitute a materially adverse employment action for purposes of a retaliation claim.

The CCJC's rejection of plaintiff Jenkins's application for Community Diversion Program Coordinator in 2002 constituted the only possible instance of retaliation against him.  In light of the undisputed evidence that Jenkins did not meet the minimum qualifications for the position, he could not establish a *prima facie* case of retaliation.  No reasonable jury could conclude that a causal connection existed between the filing of the case at bar and Jenkins's inability to attain the position.

Plaintiff McCollough also did not establish a viable retaliation claim with respect to either her applications for the Juvenile Rights Advocate and Community Diversion Program Coordinator positions or the evaluation.  McCollough failed to establish a causal connection between the filing of the case at

bar and her complaint that she had not been awarded the Juvenile Rights Advocate position.  As previously stated, the defendants' reasons for hiring Heather Union, rather than McCollough, for the Community Diversion Program Coordinator position in 2002 were that she received better ratings from the interviewers, had more relevant experience, and was more qualified than McCollough.  McCollough lacked evidence from which a reasonable jury could find that the CCJC's articulated non-retaliatory justification for rejecting her application in favor of Union was merely pretextual, and that it had actually acted for retaliatory reasons.

Plaintiff Colwell did not suffer a materially adverse employment action due to:  (1) her 2002 job performance evaluation; (2) the court's alleged re-organization to increase Unit Managers' responsibilities; (3) the demand that Colwell and others not eat lunch in McNear's office; (4) Colwell's fear of future reprimand for taking home security keys in violation of CCJC policy; or (5) her complaint about the time clock in the Detention Center.  Likewise, Colwell did not allege an adverse employment action in connection with:  (6) the Charvez James incident; (7) the cartoon incident; (8) defendant Lardomita's use of the surveillance cameras; or (9) the change in her relationships with certain CCJC employees.  None of these events amounted to a material adverse change in the fundamental terms and conditions of Colwell's employment.  Furthermore, Lardomita's use of surveillance cameras cannot be causally linked to this lawsuit.  Monitoring the cameras is part of his duties as Assistant Superintendent of Security.

As previously stated, plaintiff Prather did not suffer a materially adverse employment action due to:  (1) his August 2002 work performance evaluation; (2) his scheduling complaints; (3) his complaint

regarding holiday overtime pay; (4) possibly his complaint regarding the key chit policy; and (5) the CCJC's failure to award him the Placement Officer and Juvenile Rights Advocate positions.

The only protected activity plaintiff Moore engaged in prior to the three-day suspension in 1999 involved the filing of an EEOC complaint alleging sexual harassment against an African-American coworker. There is no evidence on record to suggest a causal connection between Moore's EEOC complaint and the suspension. Plaintiffs Bellamy and Washington did not engage in any activity protected by Ohio Rev. Code § 4112.02(I) that could serve as the basis for a retaliation claim. Any alleged retaliation against Bellamy and Washington occurred before their lawsuit was filed on October 1, 2002, and thus was not actionable.[33]

5.     _Greeley_ Claims

A *Greeley* claim for wrongful termination in violation of public policy is unavailable to union members subject to a collective bargaining agreement, as they are not at-will employees. *Haynes v. Zoological Soc'y of Cincinnati*, 73 Ohio St.3d 254, 258 (1995). The Ohio Supreme Court held in *Haynes* that the plaintiff, who was an employee subject to a collective bargaining agreement, was "outside the class of employees for whom *Greeley* provides protection" because she was not an employee-at-will. *Id.* The Court finds that plaintiffs' counsel knew or should have known that the *Greeley* claims of plaintiffs Garner, Brown, Lilly, and Colwell were without merit because they were union members subject to a collective bargaining agreement. Furthermore, plaintiffs Richardson,

---

[33]Bellamy and Washington also argued that the defendants had committed continuing acts of retaliation by refusing to rehire or reinstate them after they had "clearly shown" that their terminations were illegal. This argument lacked merit because Bellamy and Washington did not provide any evidence tending to prove that their terminations were illegal.

Brown, Dennis, Isom, Jenkins, Lilly, McCollough, McNear, Colwell, and Prather did not have meritorious *Greeley* claims because they had not been terminated as of the date the Court granted summary judgment to the defendants on their claims. These claims were groundless at the outset and counsel for plaintiffs failed to undertake the requisite investigation to support these allegations in the Second Amended Complaint.

The *Greeley* claims of plaintiffs Moore, Bellamy, and Washington, for violation of the public policy contained in Ohio Rev. Code § 4112.02, failed because they did not establish an issue of material fact with respect to each of the four elements of such a claim. They could not satisfy the jeopardy element under the circumstances present in the case at bar because the record is devoid of any facts tending to show that Moore, Bellamy, and Washington were subject to race-based discrimination. Without discrimination or retaliation, no public policy is threatened.

The failure to recall/rehire public policy claims of Bellamy and Washington also failed because Ohio common law does not recognize such claims. Indeed, Bellamy failed to direct the Court's attention to a single Ohio case that expands the wrongful termination exception to encapsulate failure to recall/rehire public policy claims.

The claims of Moore, Bellamy, and Washington for wrongful discharge in violation of the public policy embodied in Ohio Rev. Code § 4113.52, the state whistleblower statute, also failed. The record contains no evidence that Moore filed a written report as required by the statute. Bellamy and Washington admitted that they never filed a written report of criminal activity or named the alleged offenders. Furthermore, Moore and Bellamy failed to file their civil complaint in this action within the 180-day statute of limitations set forth in section (D) of the statute.

32

6.    *Respondeat Superior*

*Respondeat superior* liability was dependant upon a violation of a plaintiff's constitutional

rights.  Because plaintiffs Garner, Richardson, Brown, Dennis, Isom, Jenkins, Lilly, McCollough,

McNear, Colwell, and Prather did not establish that their rights, constitutional or otherwise, were

violated, their claims in Count VI (alleging that liability for the alleged misconduct be imposed against

the CCJC under a theory of *respondeat superior*) of the Second Amended Complaint also failed.

7.    Conspiracy

Plaintiffs Garner, Richardson, Brown, Dennis, Isom, Jenkins, Lilly, McCollough, McNear,

Colwell, and Prather also failed to prove any unlawful act independent of the civil conspiracy alleged in

Count VII of the Second Amended Complaint.

8.    Aiding and Abetting

Proof of two elements is required to establish a claim for civil aiding and abetting. *Aetna Cas.*

*& Sur. Co. v. Leahey Constr. Co., Inc.*, 219 F.3d 519, 533 (6th Cir. 2000).   Summary judgment

was entered against plaintiffs Garner, Richardson, Brown, Dennis, Isom, Jenkins, Lilly, McCollough,

McNear, Colwell, and Prather on this claim because they did not provide evidence of any underlying

breach of duty.

9.    Intentional Infliction of Emotional Distress

Intentional infliction of emotional distress, by itself, cannot amount to a constitutional violation.

The Court of Appeals for the Sixth Circuit has, however, affirmed damages for emotional and mental

anguish caused by a due process or other constitutional violation brought pursuant to § 1983. *See*

*Chatman v. Slagle*, 107 F.3d 380, 384-85 (6th Cir. 1997) (allowing recovery for emotional distress

33

after an unlawful search).  In the case at bar, summary judgment was awarded on the state law claim

for intentional infliction of emotional distress of plaintiffs Richardson, Brown, and Colwell because the

Court was unable to find any facts that would remotely approach the level of extreme and outrageous

conduct required by the high standard adopted by the Ohio Supreme Court in *Yeager v. Local Union*

*20, Teamsters, Chauffeurs, Warehousemen & Helpers of America*, 6 Ohio St.3d 369 (1983).

Plaintiffs' own admissions and testimony dispelled the existence of any claim for intentional

infliction of emotional distress.  Richardson admitted in deposition that defendants Lusnia, Munks, and

Coe did not engage in any overt acts to cause him emotional harm.  His only claim for distress as to

these defendants is that they "allowed" defendant Lardomita to be his supervisor. Richardson Depo. at

201-2.  Furthermore, Richardson admitted that he had no interaction with Judge Russo and never

notified him of any allegations of discrimination, harassment, and/or retaliation. R. to Int. 22

propounded by Russo.  The acts of Lardomita that Richardson argued caused him distress[34] plainly did

not approach the required level of extreme and outrageous conduct.

Discovery likewise revealed that Brown and Colwell did not have any evidence that Judge

Russo, Lusnia, Munks or Coe had ever engaged in any acts to cause either of them emotional harm.

Brown's only claim was about Lardomita's conduct. Brown R. to Int. 19 propounded by Munks;

Brown R. to Int. 16 propounded by Coe; and Brown Depo. at 148.  Furthermore, Brown admitted

that she had no contact with Judge Russo. R. to Int. 21 propounded by Russo.  Colwell's claims

---

[34]R. to Int. 16 propounded by Coe.

concerned the incident between her and Charvez James "orchestrated by Lardomita"[35] and Lardomita "glaring" at her.  None of these complaints, however, rose to the level of actionable "extreme and outrageous" conduct.

10.    Punitive Damages

Finally, plaintiffs Garner, Richardson, Brown, Dennis, Isom, Jenkins, Lilly, McCollough, McNear, Colwell, and Prather were not entitled to punitive damages because none of their federal or state causes of action survived summary judgment.  Furthermore, plaintiffs Moore, Bellamy, and Washington are not entitled to punitive damages because none of their federal or state causes of action survived summary judgment.

III. LAW AND DISCUSSION

The Court finds that 28 U.S.C. § 1927 and 42 U.S.C. § 1988 provide suitable standards for assessing the conduct of the plaintiffs and their counsel in the case at bar.  Furthermore, the defendants have satisfied the requirements for the imposition of fees and sanctions under §§ 1927 and 1988. Therefore, the Court will only briefly address the availability of fees and sanctions under Ohio Rev. Code § 2323.51, Fed. R. Civ. P. 11, and its inherent authority.  The award will be assessed against the plaintiffs and their counsel jointly and severally. *See* Doc. 246 at 15.

---

[35]Colwell R. to Int. 16 propounded by Coe; Colwell R. to Int. 20 and Request for Production 12 propounded by David; and Colwell Depo. at 168, 170, 270-74.

A.       *Defendants' Motion for Award of Attorney's Fees and Costs under 42 U.S.C. § 1988 (Doc. 246)*

Fed. R. Civ. P. 54 addresses motions for attorney's fees and the time within which such a motion must be filed.  The Court finds that this Motion (Doc. 246)  is timely made pursuant to Rule 54(d)(2)(B) in that it was filed within 14 days of March 11, 2005--the date of entry of the judgment on the merits in this matter (Doc. 244).  Contrary to the plaintiffs' argument,[36] the Orders (Docs. 208-217 and 219), entered in November and December 2004, did not trigger the Rule 54(d)(2)(B) fourteen-day filing requirement.  These orders were not final orders subject to appeal.  Rule 54(a) defines the term "judgment" and states that a judgment "includes a decree and any order from which an appeal lies." The Advisory Committee Notes to the 1993 Amendments indicate that the deadline for motions for attorney's fees is "14 days after final judgment. . . .  One purpose of this provision is to assure that the opposing party is informed of the claim before the time for appeal has elapsed."  The Rule thus suggests a relationship between a judgment and its appealability.  The Orders (Docs. 208-217 and 219) were not appealable when they were entered because they did not comprise a "final decision" under 28 U.S.C. § 1291.  "A 'final decision' generally is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 199 (1988) (internal quotation and citation omitted); *see also Castro County, Texas v. Crespin*, 101 F.3d 121, 128 (D.C. Cir. 1996).

Section 1988 of Title 42 of the United States Code authorizes district courts to award reasonable attorney's fees to prevailing civil rights litigants.  Section 1988(b) provides in relevant

---

[36]Transcript of May 20, 2005 Hearing (Doc. 279) at 33.

part: "In any action or proceeding to enforce a provision of section[ ] . . . 1983 . . . of this title, . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

No attorney's fees will be awarded due to the inclusion of Janie Carter, Charvez James, Al David, Richard Drost, and Jimmy Dimora as defendants. *See* Notice of Dismissal (Doc. 59) and Stipulation of Dismissal "without costs to either party" (Doc. 83).

Plaintiffs assert that § 1988 attorney's fees apply to the recovery of attorney's fees in federal civil rights actions, not the state law claims contained in the Second Amended Complaint (Doc. 48). Transcript of May 20, 2005 Hearing (Doc. 279) at 33. Attorney Frost points out that three of the plaintiffs (Moore, Bellamy, and Washington) had no federal claims at the time summary judgment was entered against them. *Id.* at 24. The Court will not distinguish between the fees incurred in defense of the § 1983 claims and those incurred in defense of the other claims, because all of the plaintiffs' claims rested on "a common core of facts." *Munson v. Milwaukee Board of School Directors*, 969 F.2d 266, 271-72 (7th Cir. 1992); *see also Roger Whitmore's Automotive Services, Inc. v. Lake County, Ill.*, No. 99 C 2504, 2004 WL 2414794, at *8 (N.D.Ill. Oct. 26, 2004).[37]

---

[37]United States District Judge Samuel Der-Yeghiayan subsequently granted the County Defendants' motion for attorney's fees and motion for costs after reviewing *de novo* the report and recommendation of United States Magistrate Judge Sidney I. Schenkier. *Roger Whitmore's Automotive Services, Inc. v. Lake County, Ill.*, No. 99 C 2504, 2004 WL 2806389 (N.D. Ill. Dec. 3, 2004). As to the award of attorney's fees, the Court of Appeals for the Seventh Circuit recently affirmed in part, reversed in part, and remanded the case to the district court for further proceedings. *Roger Whitmore's Auto. Services, Inc. v. Lake County, Illinois*, --- F.3d ---, No. 04-1978, 05-1033, 2005 WL 2297307, at *14-15 (7th Cir. Sept. 22, 2005).

In *Munson*, the plaintiff brought a § 1983 claim and three pendent state law claims, alleging that they arose from the same course of conduct.  The Seventh Circuit held that when the federal and pendent state claims are factually or legally related, and when both the federal and state claims are found to be frivolous, they should be treated as one action for purposes of fee awards under § 1988. *Id.* at 272.  The *Munson* court reasoned that:

> If a plaintiff can be awarded fees for work done on an *unsuccessful* pendent state claim which is factually or legally related to a successful civil rights claim, then defendants likewise should be entitled to fee awards for defending frivolous pendent claims factually or legally related to frivolous civil rights claims. Separating out the legal services rendered for the federal and pendent claims would be futile in both circumstances.

 *Id.* (Emphasis in original.)

The Court is very aware that awarding attorney's fees to the defendants under § 1988 in a case such as this may have a chilling effect on potentially meritorious civil rights plaintiffs.  Furthermore, "[a]n award of attorney's fees against a losing plaintiff in a civil rights action is an extreme sanction, and must be limited to truly egregious cases of misconduct." *Jones v. Continental Corp.*, 789 F.2d 1225, 1232 (6th Cir. 1986); *see also Pickens v. Children's Mercy Hospital*, 124 F.R.D. 209 (W.D. Mo. 1989);[38] Transcript of May 20, 2005 Hearing (Doc. 279) at 32.

The Court holds that most of the claims of plaintiffs Garner, Richardson, Brown, Dennis, Isom, Lilly, McNear, Moore, Bellamy, and Washington were frivolous, unreasonable, and without foundation, and that these plaintiffs should have dismissed their claims after discovery had shown that they were

---

[38]The Court was unable to locate the exact language quoted by Attorney Frost at page 4 of plaintiffs' Amended Memorandum in Opposition (Doc. 271).

38

without factual support.  Because the Court finds that the record does not provide the plaintiffs with reasonable grounds for bringing these claims, the Court therefore concludes that the defendants are entitled to attorney's fees for the preparation of motions for summary judgment pertaining to all of the plaintiffs' claims except those of plaintiffs Jenkins, McCollough, Prather, and Wesley and the following claims of plaintiffs Washington, Bellamy, and Moore:  "(1) Count III, claims brought under 42 U.S.C. Section 1983; (2) Count V, Retaliation; (3) Count VI, Respondeat Superior; (4) Count VII, Civil Conspiracy; and, (5) Count VIII, Civil Aiding-Abetting."[39]  In addition, the Court will grant the defendants attorney's fees for discovery costs related to the legally groundless claims based on the plaintiffs' litigation tactics. *See, e.g.*, Doc. 252 at Exhibit 1--Letter, dated March 26, 2003, from Attorney Frost to defense counsel;  Doc. 92 at Exhibit 9--Letter, dated April 3, 2003, from defense counsel to Attorney Frost; and Doc. 252 at Exhibit 2--Letter, dated April 10, 2003, from Attorney Frost to defense counsel regarding missing and incomplete discovery responses.

Defendants contend that in both plaintiffs' responses to written discovery requests and plaintiffs' deposition testimony, many of the plaintiffs made direct statements under oath that they had never been subjected to discrimination and/or retaliation by certain defendants and that, in several instances, never had any type of contact with certain defendants.  For example, defendant Lusnia was not even employed by the CCJC in 1998 at the time plaintiffs Wesley, Bellamy, Washington, and Moore alleged to have been discriminated against; yet, these plaintiffs continued to pursue individual liability against

---

[39]Stipulation of Partial Dismissal of Claims of Plaintiffs Washington, Bellamy, and Moore (Doc. 227).

defendant Lusnia. Doc. 246 at Exhibit 2--Lusnia Affidavit; Doc. 48.[40]  Defendants argue that the

plaintiffs compounded these proceedings in their misguided pursuits by providing conflicting

interrogatory answers, deposition testimony and even affidavits containing allegations contradicting their

own prior statements.

The heart of the 14 extensive motions for summary judgment is the statement of the factual

record that the parties jointly developed during discovery.  That factual record was fully developed by

the end of July 2003, when the extended discovery period had closed.  All parties had access to the

same factual record.  Plaintiffs' Third Status Report (Doc. 56), filed on February 25, 2003,  provides in

pertinent part:

> Plaintiffs have completed all of their discovery.  Plaintiffs are simply waiting for the
> defendants to respond with the outstanding written requests, due Friday, February 28,
> 2003.  Plaintiffs have completed numerous deposiitons (sic) of the defendants and other
> witnesses, and fdo (sic) not anticapate (sic) conducting any further discovery.

Further, in a letter dated February 25, 2003, Attorney Frost stated:  "I am already preparing my

Motion for Summary Judgment, I do not need the additional time [to conduct discovery] I simply need

my outstanding discovery." Doc. 57 at Ex. B.  However, after the Court extended the discovery cutoff

---

[40]On January 9, 2004, the plaintiffs filed a Proposed Dismissal of Claims (Doc. 188)
against defendants Lusnia, Lardomita, and Coe. *See* Transcript of May 20, 2005 Hearing
(Doc. 279) at 25 and 28-30.  Plaintiffs Bellamy, Washington, and Wesley proposed *inter alia*
that all claims against defendant Lusnia be dismissed without prejudice.  This was after the
defendants exhausted substantial resources through discovery. *See* Defendants' Response
(Doc. 192); *Grover by Grover v. Eli Lilly and Co.*, 33 F.3d 716, 718 (6th Cir. 1994)
(district court abused its discretion by ordering the cases dismissed without prejudice because
the defendant suffered plain legal prejudice).

until June 15, 2003, the plaintiffs:

> noticed the depositions of Raymond Walker, Charvez James, Janie Carter, and Len Munks for May 15, 2003 (*see* Doc. 89);[41] and

> propounded requests for admissions upon Joseph F. Russo, Administrative Judge of the Cuyahoga County Juvenile Court , on May 20, 2003 (*see* Doc. 104).

On June 5, 2003, the parties filed a Joint Motion to Extend All Impending Deadlines (Doc. 112) so they could discuss a potential settlement of the case.  The discovery cutoff was extended to July 16, 2003.  On July 16, 2003, the parties filed a second Motion to Extend Discovery Cutoff (Doc. 119) until July 31, 2003, due in part to an intervening mediation, which was conducted on July 14, 2003.

Plaintiffs' Fourth Status Report (Doc. 130), filed on August 28, 2003, also provided that "Plaintiffs have completed all of their discovery."  However, on September 10, 2003, plaintiffs filed a Motion for Leave to Take One Additional Deposition (Doc. 134).  They wanted to take the deposition of Mr. Patterson, a supervisor, regarding defendant Lardomita being involved in a bar fight that may have resulted in Lardomita being convicted of a crime.  Plaintiffs could then order the certified copy of his conviction, if any, to show additional disparate treatment.  The motion was denied by marginal entry order (Doc. 199) on March 25, 2004.  However, the Court had announced its ruling at the Final Pretrial Conference on December 30, 2003.

---

[41]Len Munks and two non-party witnesses, Marva Cabel and Raymond Walker, were deposed. *See* Doc. 118 at 3 and Doc. 131 at 2.

The general rule, known as the "American Rule," is that each party to a lawsuit is responsible for his or her own attorney's fees. *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247, 258-59 (1975). However, "[t]he Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, authoriz[es] the district courts to award a reasonable attorney's fee to prevailing parties in civil rights litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983). A district court's denial of attorney's fees to the prevailing party is reviewed for an abuse of discretion. *Black v. Ryder/P.I.E. Nationwide, Inc.*, 970 F.2d 1461, 1472 (6th Cir.1992).

A prevailing defendant in a civil rights action may recover attorney's fees from a plaintiff when the district court finds that the plaintiff's action was "frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so." *Hughes v. Rowe*, 449 U.S. 5, 15 (1980) (per curiam) (quoting *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422 (1978); *see also Christian v. Belcher*, 888 F.2d 410, 417 (6th Cir.1989) (The Supreme Court has made clear that attorney's fees may not be awarded against a civil rights plaintiff unless "the plaintiff's action [is] 'frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith.'") (quoting *Hughes*, 449 U.S. at 14 (quoting *Christiansburg Garment Co.*, 434 U.S. at 421)); *Wayne v. Village of Sebring*, 36 F.3d 517, 530 (6th Cir. 1994), *cert. denied*, 514 U.S. 1127 (1995); *Tarter v. Raybuck*, 742 F.2d 977, 985 (6th Cir. 1984), *cert. denied*, 470 U.S. 1051 (1985).

In applying the *Christiansburg Garment Co.* standard, "it is important that a district court resist the understandable temptation to engage in post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation. This

42

kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success." *Christiansburg Garment Co.*, 434 U.S. at 421-22; *Wilson-Simmons v. Lake County Sheriff's Dep't*, 207 F.3d 818, 823 (6th Cir. 2000). Courts must balance the policy of encouraging the pursuit of valid civil rights claims against the public interest in discouraging baseless or vindictive lawsuits.

Some of the claims of plaintiffs Jenkins, McCollough, and Prather were not frivolous. The Court of Appeals for the Sixth Circuit has previously held that it is an abuse of discretion to award attorney's fees to a prevailing defendant where any part of the plaintiff's cause of action was not frivolous. *Haynie v. Ross Gear Div. of TRW, Inc.*, 799 F.2d 237, 242 (6th Cir. 1986), *vacated as moot*, 482 U.S. 901 (1987) ("where one of the plaintiff's claims is non-frivolous, the defendant's attorney fees may not be shifted to the plaintiff even though others of the plaintiff's claims are patently without merit"); *Tarter*, 742 F.2d at 987-88 (awarding attorney's fees was an abuse of discretion even though some of the plaintiff's claims were meritless). In *Tarter*, a high school student and his parents brought a cause of action under 42 U.S.C. § 1983 alleging that school administrators had violated the plaintiffs' Fourth Amendment rights by searching the student and detaining all three of them without consent. *Id.* at 978-79. The Sixth Circuit reversed the district court's award of attorney's fees to the defendants, holding that "the issue of a student's fourth amendment rights in the context of a search by a school official is not a well settled area of the law." *Id.* at 987.

Three weeks ago in *Balmer v. HCA, Inc.*, --- F.3d ---, No. 04-5688, 04-6199, 2005 WL 2218414  (6th Cir. Sept. 14, 2005), the Court of Appeals, based on the language of *Haynie* and *Tarter*, concluded that "in this circuit attorneys' fees may not be awarded to defendants where the

43

plaintiff has asserted at least one non-frivolous claim." *Id.* at \*10.  Courts should consider the following factors when making an attorney's fees determination:  (1) whether the plaintiff presented sufficient evidence to establish a *prima facie* case; (2) whether the defendant offered to settle the case;[42] and (3) whether the trial court dismissed the case prior to trial or held a full-blown trial on the merits. *Id.* at \*8 (citing *EEOC v. L.B. Foster Co.*, 123 F.3d 746, 751 (3rd Cir. 1997)).

In the case at bar, plaintiff Jenkins's disparate treatment claim failed because he did not prove a *prima facie* case of discrimination with respect to any of his complaints, excepting the CCJC's failure to appoint him to a Unit Manager position in 1999.  Although Jenkins did establish a *prima facie* case with respect to that claim, he lacked evidence from which a reasonable jury could find that the CCJC's articulated non-discriminatory reason for rejecting him in favor of Julia Chessler (a Caucasian) for the Unit Manager position was pretext.

Plaintiff McCollough's disparate treatment claim also failed because she did not prove a *prima facie* case of discrimination with respect to any of her complaints, excepting her claims that she was unfairly denied the positions of Community Diversion Program Coordinator and Sheltercare Coordinator.  Regarding those claims, McCollough lacked evidence from which a reasonable jury could find that the CCJC's articulated non-discriminatory reasons for its actions were pretext.  In addition, even assuming that McCollough did establish a *prima facie* case with respect to the CCJC's rejection of her application for the Community Diversion Program Coordinator position, she failed to

---

[42]In a letter dated July 10, 2003, the defendants in the case at bar offered to settle the suits of plaintiffs Richardson, Brown, Dennis, Isom, Jenkins, Lilly, McCollough, McNear, Colwell, and Prather for a lump sum of $100,000 in the interests of avoiding further costs. Doc. 246 at Ex. 3.

establish a viable claim of retaliation.  McCollough lacked evidence from which a reasonable jury could find that the CCJC's articulated non-retaliatory justification for rejecting her application in favor of Heather Union was merely pretextual, and that it had actually acted for retaliatory reasons.

Finally, plaintiff Prather's disparate treatment claim failed because he did not prove a *prima facie* case of discrimination with respect to any of his complaints, excepting his claim that he was unfairly denied a promotion to the position of Compliance Officer in 2001.  Although Prather did establish a *prima facie* case with respect to that claim, he lacked evidence from which a reasonable jury could find that the CCJC's articulated non-discriminatory reasons for rejecting him in favor of James Legarth  (a Caucasian) for the Compliance Officer position was pretext for discrimination. Therefore, the Court will not award attorney's fees against plaintiffs Jenkins, McCollough, and Prather because they have "asserted at least one non-frivolous claim." *Balmer*, 2005 WL 2218414, at *10.

Moreover, plaintiff Colwell's disparate treatment claim failed because she did not prove a *prima facie* case of discrimination with respect to any of her complaints, excepting her claim that she was unfairly denied the position of Sheltercare Coordinator.  Although Colwell did establish a *prima facie* case with respect to that claim, she did not carry her burden of persuasion at the pretext phase of the disparate treatment analysis.

"A prevailing defendant should only recover upon a finding by the district court that 'the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith.'" *Wayne v. Village of Sebring*, 36 F.3d 517, 530 (6th Cir. 1994) (quoting *Christiansburg Garment Co.*, 434 U.S. at 421); *White v. City of Ypsilanti*, No. 96-2414, 1997 WL 705253, at * 1 (6th Cir. Nov. 4, 1997) ("Since White continued to pursue his claims after his

deposition revealed that he could not prevail, we find that the District Court did not err in awarding defendants attorney fees accrued during the five-month period between White's deposition and the dismissal of his claims.").

To determine whether a claim is frivolous, unreasonable or groundless, the court must determine the plaintiff's basis for filing suit. *Smith v. Smythe-Cramer Co.*, 754 F.2d 180, 183 (6th Cir.), *cert. denied*, 473 U.S. 906 (1985).  Plaintiffs make much ado about the fact that their counsel represented another plaintiff in a prior case in Cuyahoga County, Ohio Common Pleas Court (*Ruby Davis v. Cuyahoga County Juvenile Court, et al.*, Case No. CV-01-449252)[43] "against the exact same defendants; for the exact same claims, race discrimination, retaliation; and some of the plaintiffs in this case were witnesses in the underlying case where **a unanimous jury found race discrimination and the judge denied summary judgment.**" (Emphasis in original). Doc. 271 at 2; Doc. 20 at 2.  Plaintiffs argue that the "jury verdict in and of itself gives reasonable cause to show discriminatory animus by defendants." Doc. 239 at 6.  Attorney Frost stated the following during the oral argument held on May 20, 2005:

> . . . the defendants in this case, defendant Ken Lusnia who was found by a jury not only to have -- him and the Court, to have found for race discrimination on a case that I litigated, but they found intentional and awarded punitive damages against defendant Ken Lusnia.  It was for race discrimination and retaliation.
> And some of the plaintiffs in this case also participated in that, and a lot of the evidence that we used in this case was used in the case which was the Ruby Davis case.

---

[43]R. Jack Clapp, Esq. did file a Motion to Withdraw as Counsel of Record for plaintiff Ruby Davis in the prior state court case.  The motion was granted on July 29, 2004.

46

It defies logic that the fact that I had already won a case against these same defendants, that this would be a frivolous case.  In and of itself it already shows that not only that, but it also shows that the county has done nothing about race discrimination.

They have an administrator who was found by a jury, unanimous 8-0 that there was race discrimination and 7-0 for punitive damages, yet he continues to work at the county, which in and of itself shows that the county has a history of race discrimination.

Transcript of May 20, 2005 Hearing (Doc. 279) at 15.

There is evidence indicating that there was no "colorable basis" for filing the § 1983 claims of plaintiffs Washington, Wesley, Bellamy and Moore.  Second, there is an abundance of evidence which demonstrates that twelve of the plaintiffs (Garner, Dennis, Lilly, Isom, Prather, McNear, Jenkins, McCollough, Washington, Wesley, Bellamy, and Moore) should not have continued to prosecute their intentional infliction of emotional distress claims.  On July 15, 2003, Attorney Frost sent a letter to defense counsel admitting that the Second Amended Complaint needed to be "'clean(ed) up' . . . most likely by agreement." Doc. 246 at Exhibit 4.[44]  As noted in the Court's Order (Doc. 221), entered on December 7, 2004:

> The Court advised Plaintiffs' counsel at a conference held on 12/30/03 [after 11 Motions for Summary Judgment had been filed by Defendants], that a preliminary review of the record had revealed that a number of Plaintiffs' claims, including claims for intentional infliction of emotional distress, appeared to lack merit.  The Court further advised that counsel should strongly consider dismissing any such claims.  Counsel dismissed claims for intentional infliction of emotional distress brought on behalf of eight of 11 Plaintiffs.  Counsel did not dismiss any other claims, and they remained pending for the Court's decision on summary judgment.

*Id.* at 3.

---

[44]The letter also stated:  "in the future, you may want to call me ahead of time to see if I want to stipulate to certain procedural issues."

47

On September 15, 2003, the defendants filed 11 motions for summary judgment (Docs. 135-145).  A proposed Stipulated Partial Dismissal of Claims (Doc. 196) for intentional infliction of emotional distress was not filed until January 27, 2004.  The Court finds that plaintiffs' counsel knew or should have known that the intentional infliction of emotional distress claims of plaintiffs Garner, Dennis, Lilly, Isom, Prather, McNear, Jenkins, McCollough, Washington, Wesley, Bellamy, and Moore were without merit. *See* Transcript of May 20, 2005 Hearing (Doc. 279) at 26.  Defendants should not have had to file motions for summary judgment on these claims before Attorney Frost would stipulate to a dismissal with prejudice.  The Court stated as early as May 21, 2003, that

> although all plaintiffs claim intentional infliction of emotional distress, apparently only five plaintiffs sought medical treatment or claimed physical manifestations.  Defendants requested medical record releases for all plaintiffs.  Plaintiffs offered releases for only the five plaintiffs.  The Court ordered plaintiffs to produce signed release forms for the five plaintiffs who sought medical treatment or claimed physical manifestations.

Order (Doc. 107) at 3; *see Buckman-Peirson v. Brannon*, 159 Ohio App.3d 12, 822 N.E.2d 830, 838-41 (Ohio Ct.App. 2004) (expert medical testimony not necessary, but some evidence beyond the plaintiff's own testimony is).

On January 9, 2004, the plaintiffs filed a Proposed Dismissal of Claims (Doc. 188) against Lusnia, Lardomita, and Coe without prejudice.  This was after these three defendants had requested on September 15, 2003, that the Court enter summary judgment on some of these claims.  Furthermore, a

Stipulation of Dismissal of All Claims of Plaintiff Kevin Wesley (Doc. 226)[45] was not filed until January 18, 2005, which dismissal occurred after summary judgment had been awarded to the defendants on all the claims of 11 plaintiffs.

B.      *Defendants' Motion for Attorney's Fees and Sanctions for Frivolous Conduct under Ohio Rev. Code §2323.51 (Doc. 252)*

The Court holds that the defendants in the case at bar are not entitled to attorney's fees under Ohio Rev. Code §2323.51, which allows for fees based upon the conduct of the parties and the attorneys in filing and litigating the claims, rather than for success on the underlying merits of the claims. Section 2323.51 provides that the Court may award reasonable attorney's fees to any party to that action "adversely affected by frivolous conduct." *See* Ohio Rev. Code § 2323.51(B)(1).  The statute further defines frivolous conduct as litigation that:  (1) obviously serves merely to harass or maliciously injure another party; or (2) is not warranted under existing law and cannot be supported by a good faith argument for an extension, modification, or reversal of existing law. Ohio Rev. Code § 2323.51(A)(2)(a) and (b).

The Court finds that there is insufficient support in the record for fees and sanctions under Ohio Rev. Code §2323.51, which works in tandem with Fed. R. Civ. P. 11.  "Rule 11 should govern the award of sanctions for frivolous conduct." *First Bank of Marietta v. Hartford Underwriters Ins.*

---

[45]This dismissal with prejudice was "without costs to either party." *Jennings v. Metropolitan Government of Nashville*, 715 F.2d 1111, 1114 (6th Cir. 1983) (silence of the settlement agreement notwithstanding, the record supported "the single inference that the parties agreed to settle their dispute in full [including the issue of attorney's fees]").  "Costs" are commonly understood to include attorney's fees. *Brown v. General Motors Corp., Chevrolet Div.*, 722 F.2d 1009, 1012 (2d Cir. 1983).  Therefore, the defendants will not be able to recover costs, including attorney's fees, from Wesley.

*Co.*, 307 F.3d 501, 529 (6th Cir. 2002).  The Ohio statute also conflicts with Fed. R. Civ. P. Rule

11's safe harbor provision and, therefore, should not be applied in federal court. *Id.* at 529-30.

C.    *Defendants' Motion for Attorney's Fees as Sanctions under Rule 11, 28 U.S.C. 1927, and this Court's Inherent Authority (Doc. 263)*

1.    Fed. R. Civ. P. 11 Sanctions

In the Sixth Circuit, "the test for the imposition of Rule 11 sanctions is whether the individual's

conduct was reasonable under the circumstances." *See Tropf v. Fidelity Nat. Title Ins. Co.*, 289 F.3d

929, 939 (6th Cir. 2002), *cert. denied*, 537 U.S. 1118 (2003) (quotation omitted).  Rule 11(b) states,

in part, that a party who signs a pleading, written motion, or other paper avers that

> (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery;

> \*    \*    \*    \*

Fed. R. Civ. P. 11.

Sanctions *may* be imposed under Rule 11 if, for any improper purpose, an attorney or party has signed

and filed a pleading, motion, or other paper which lacks a reasonable basis in law or fact. *See Mann v.*

*G & G Mfg., Inc.*, 900 F.2d 953, 958 (6th Cir.), *cert. denied*, 498 U.S. 959 (1990); *see also Ridder*

*v. City of Springfield*, 109 F.3d 288, 293 (6th Cir. 1997) (stating that the imposition of sanctions for

violations of Rule 11 is discretionary rather than mandatory), *cert. denied*, 522 U.S. 1046 (1998).

The within motion is not the first time that the defendants have sought an award of sanctions pursuant to Rule 11.  In February 2003, Attorney Frost filed a document styled "Plaintiffs Notice to Court" (Doc. 61).  On April 23, 2003, the defendants filed a Motion for Sanctions (Doc. 81) requesting an order finding Attorney Frost in violation of Civ. R. 11(b) and for sanctions to deter repetition of such conduct.  It stated that "[d]espite serving Ms. Frost with this Motion, as prescribed by Civ. R. 11, she refused to withdraw the challenged document."  Defense counsel had previously stated in a safe harbor letter, dated March 20, 2003, to Attorney Frost (Doc. 81 at Ex. A):

> Enclosed, please find Defendants' Motion for Sanctions related to your filing of the "Plaintiffs' Notice to Court" on February 26, 2003.  Pursuant to Civ. R. 11, the Defendants are serving you with this Motion twenty-one (21) days prior to filing.  If you do not withdraw your Notice, the Defendants will file the Motion upon the expiration of the period.

Defendants now contend that its service of two letters on the plaintiffs are safe harbor letters for the within motion under Rule 11.  Defense counsel stated at page seven of a letter, dated January 20, 2004, to Attorney Frost (Doc. 263 at Ex. 12)

> that it is our position that the Plaintiffs' own admissions and testimony dispel the existence of any claim for Intentional Infliction of Emotional Distress [on behalf of plaintiffs Brown, Richardson, and Colwell], and that all such IIED claims should have been dismissed at a much earlier stage of this litigation, requiring that all these claims, on behalf of all plaintiffs, must be dismissed, with prejudice.

This eight-page letter, however, does not suggest pursuit of Rule 11 sanctions.  Defense counsel stated in another letter, dated December 29, 2004, to Attorney Frost (Doc. 263 at Ex. 11) that

> If [the § 1983 claims of plaintiffs Washington, Wesley, Bellamy, and Moore] are not voluntarily dismissed forthwith, Defendants will take all action necessary to bring this matter to the attention of the Court and will have no option but to seek all available remedies to recover costs and fees associated with the continued defense of these claims.

51

With regard to the letter, dated December 29, 2004, it is to be noted that as of July 24, 2003, plaintiffs Washington, Wesley, Bellamy, and Moore did not have any opposition to judgment on the pleadings being entered against them as to their § 1983 equal protection claims. *See* Doc. 122; Doc. 246 at Exhibit 4.  Furthermore, the defendants acknowledged that this was Attorney Frost's position as to the claims of these four plaintiffs brought under 42 U.S.C. § 1983. *See* Doc. 123 at 1. So, it is of no import to the within motions that Washington, Wesley, Bellamy, and Moore did not agree to a dismissal of their § 1983 claims until January 2005. *See* Stipulation of Dismissal of All Claims of Plaintiff Kevin Wesley (Doc. 226), filed on January 18, 2005, and Stipulation of Partial Dismissal of Claims of Plaintiffs Washington, Bellamy, and Moore (Doc. 227), filed one day later.[46]

The Second Amended Complaint (Doc. 48) alleges that plaintiffs Washington, Wesley, and Bellamy were "wrongfully" terminated on or about November 8, 1998. *Id.* at ¶¶ 1-3.  It further alleges that plaintiff Moore was wrongfully terminated or constructively discharged on or about August 1999. *Id.* at ¶ 4.  Their initial complaint was filed in the Cuyahoga County Court of Common Pleas in October 2002.  These claims were groundless at the outset.  On July 9, 2003, the defendants filed a Motion for

---

[46]Like Doc. 226, this dismissal with prejudice was "without costs to either party." Therefore, the defendants will also not be able to recover costs, including attorney's fees, for the following claims of Washington, Bellamy, and Moore:  "(1) Count III, claims brought under 42 U.S.C. Section 1983; (2) Count V, Retaliation; (3) Count VI, Respondeat Superior; (4) Count VII, Civil Conspiracy; and, (5) Count VIII, Civil Aiding-Abetting." *See* n. 45, *supra*. These stipulations were submitted after the Status Conference held on January 12, 2005, and before the defendants filed motions for summary judgment (Docs. 234-236) on the race discrimination, retaliation, and public policy claims of these three remaining plaintiffs.

Partial Judgment on the Pleadings (Doc. 116) that requested judgment as follows:

> 1. On the allegations of Plaintiffs Thomas Washington, Kevin Wesley, Spencer Bellamy and Monique Moore in Count III, for violation of constitutional rights actionable under Title 42 USC § 1983 because the claims are barred by the statute of limitations.[47]

> 2. On allegation brought under Title 42 USC § 1983 against the Cuyahoga County Juvenile Court, Judge Joseph F. Russo, Administrative Judge, Len Munks, Kenneth Lusnia, Angelo Lardomita, and Donna Coe for acts taken in their official capacity because neither the court nor its officials are "persons" within the meaning of Section 1983 while acting in an official capacity.

> 3. On the allegations in Count II claiming Plaintiffs were wrongfully discharged or disciplined in violation of the public policy exception to at-will employment (Greeley claim) for claims based on violation of the public policy promoted by Chapter 4112 of the Ohio Revised Code.

Plaintiffs responded by conceding two of the issues.  Plaintiffs did "not have any opposition to the motion as it relates to the two year statute of limitations on the section 1983 (equal protection claim)."

Plaintiffs also had no opposition to judgment on the pleadings being entered against the plaintiffs "as to the 'Greeley' claim (public policy exception) as to R.C. 4112." Doc. 122 at 1; *see also* Transcript of

---

[47]This request was the subject of an addendum and request for enlargement of time (Doc. 147) filed on September 15, 2003.

53

May 20, 2005 Hearing (Doc. 279) at 30-31.  In spite of controlling law to the contrary,[48] the plaintiffs continued to challenge the defendants' claim that the CCJC officials could not be sued in their official capacities under § 1983.

The Court finds that the defendants are not entitled to Rule 11 sanctions because there has not been a sufficient showing of compliance with the "safe harbor" provision of Fed. R. Civ. P. 11. *First Bank of Marietta*, 307 F.3d at 526-28.  When a party moves for sanctions under Fed. R. Civ. P. 11, a safe harbor provision gives the party and attorneys against whom sanctions are to be sought the opportunity to withdraw or correct the challenged document without adverse consequences.  Rule 11(c)(1)(A) provides that a motion for sanctions "shall not be filed with or presented to the court unless, within 21 days after service of the motion . . . the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected."  A party seeking sanctions under Rule 11 first must serve (but not file) the motion for sanctions upon the party against whom sanctions are sought as provided by Fed. R. Civ. P. 5.  The moving party may file the motion in the trial court

_____

[48]Under Ohio law, the CCJC is a political subdivision of the state. *Oswald v. Lucas County Juvenile Det. Ctr.*, No. 3:98CV7013, 1999 WL 504209, at *4 (N.D. Ohio 1999), *aff'd*, No. 99-3771, 2000 WL 1679507 (6th Cir. Oct. 30, 2000).  "*[S]tate* governments, and their arms, officers, and instrumentalities, are generally immune from private lawsuit in federal court by virtue of the Eleventh Amendment to the United States Constitution." *Oswald*, 2000 WL 1679507, at *2 (quoting *Mumford v. Basinski*, 105 F.3d 264, 267 (6th Cir.)), *cert. denied*, 522 U.S. 914 (1997); *see also Triplett v. Connor*, 109 Fed.Appx. 94, 96 & n. 4 (6th Cir. 2004).  The United States Supreme Court has held that "a judgment against a public servant in 'his official capacity' imposes liability on the entity that he represents . . . ." *Brandon v. Holt*, 469 U.S. 464, 471 (1985).  Because the entity represented by defendants Judge Russo, Lusnia, Munks, Lardomita, and Coe, kna Apanasewicz (the CCJC) is an arm of the state, the Eleventh Amendment shields them, in their official capacities, from § 1983 legal actions in federal court.

only if, after 21 days, the party against whom sanctions are sought has not corrected or withdrawn the allegedly offending document. 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1337.2 (2004).

2.      28 U.S.C. § 1927

Section 1927 of Title 28 of the United States Code provides that any attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  The statute holds an attorney personally liable for excess costs attributable to his or her misconduct.

As the Court of Appeals for the Sixth Circuit stated in *Wilson-Simmons*, *supra*,

Sanctions under § 1927 are warranted "when an attorney has engaged in some sort of conduct that, from an objective standpoint, 'falls short of the obligations owed by a member of the bar to the court and which, as a result, causes additional expense to the opposing party.'" *Holmes v. City of Massillon, Ohio*, 78 F.3d 1041, 1049 (6th Cir.) (quoting *In re Ruben*, 825 F.2d 977, 984 (6th Cir.1987), *cert. denied*, 485 U.S. 934, 108 S.Ct. 1108, 99 L.Ed.2d 269 (1988)), *cert. denied*, 519 U.S. 935, 117 S.Ct. 312, 136 L.Ed.2d 228 (1996).  "An attorney's ethical obligation of zealous advocacy on behalf of his or her client does not amount to *carte blanche* to burden the federal courts by pursuing claims that are frivolous on the merits. . . .  Accordingly . . . when an attorney knows *or reasonably should know* that a claim pursued is frivolous, or that his or her litigation tactics will needlessly obstruct the litigation of nonfrivolous claims, a trial court does not err by assessing fees attributable to such actions against the attorney." *In re Ruben*, 825 F.2d at 984 (quoting *Jones v. Continental Corp.*, 789 F.2d 1225, 1230 (6th Cir. 1986)).  Bad faith is not required to support a sanction under § 1927. *Jones*, 789 F.2d at 1230.

*Id.* at 824.

It should have been patently obvious to counsel for plaintiffs that the background facts alleged in ¶¶ 1-4 of the Second Amended Complaint (Doc. 48) did not, as a matter of law, support a timely

§ 1983 claim for plaintiffs Washington, Wesley, Bellamy, and Moore.  However, "[a] sanction is

generally improper where a successful motion could have avoided any additional legal expenses by

defendants." *In re Ruben*, 825 F.2d at 988.  Therefore, the Court will not impose a sanction related to

the § 1983 equal protection claims of Washington, Wesley, Bellamy, and Moore and "the 'Greeley'

claim (public policy exception) as to R.C. 4112" because Attorneys Frost and Ita did not have any

opposition to defendants' Motion for Judgment on the Pleadings as to these claims. *See* Doc. 122 at 1.

Given the facts of this case, the Court concludes that, excepting the § 1983 claims for plaintiffs

Washington, Wesley, Bellamy, and Moore and "the 'Greeley' claim (public policy exception) as to

R.C. 4112," Attorneys Frost and Ita engaged in conduct proscribed by 28 U.S.C. § 1927 which

multiplied the litigation unreasonably or vexatiously.  The conduct also caused "excess costs."  Because

the Court believes that plaintiffs' counsel intentionally pursued meritless claims, the Court will award the

defendants fees under § 1927 for the hours related to the preparation of the summary judgment motions

and some of the discovery conducted by the parties.[49]

The Court recognizes that the extensive discovery requested and responded to by the

defendants in order to prevail on summary judgment does not constitute vexatious conduct on behalf of

plaintiffs' counsel. *Riddle v. Egensperger*, 266 F.3d 542, 556 (6th Cir. 2001).  However, the

plaintiffs' claims in the case at bar were shown to be patently without merit in their responses to written

---

[49]An additional ground for imposing costs and fees is Local Rule 7.1(i), which states:
Filing a frivolous motion or opposing a motion on frivolous grounds may result
in the imposition of appropriate sanctions including the assessment of costs and
attorneys' fees against counsel and/or the party involved.
*See Swank v. Thompson*, Case No. 1:98CV2343, slip op. (N.D. Ohio June 14, 2000), *aff'd*,
25 Fed. Appx. 418 (6th Cir. Feb. 5, 2002).

discovery. Defendants issued each plaintiff detailed interrogatories, requests for admissions, and requests for documents, asking the plaintiffs to identify each and every instance in which they had been personally subjected to acts of discrimination, acts of harassment, treated differently based on their race, retaliated against, or been subject to a hostile environment as a result of each individual defendant's actions. Moreover, the Court had to resolve the discovery issues that remained between the parties at a conference conducted on May 21, 2003. *See* Order (Doc. 107).

3.      The Court's Inherent Power to Impose Sanctions

In *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991), the Supreme Court emphasized that the inherent authority of the Court is an independent basis for sanctioning bad faith conduct in litigation. The Supreme Court affirmed the district court's award of attorney's fees and expenses totaling $996,644.65 for the defendant's series of meritless motions and pleadings and delaying actions. *Id.* at 38. However, the Supreme Court stated that "the court ordinarily should rely on the Rules [and statutes] rather than the inherent power." *Id.* at 50.

The Court of Appeals for the Sixth Circuit stated in *Tiedel v. Northwestern Michigan College*, 865 F.2d 88, 93-94 (6th Cir. 1988), that, absent Congressional authorization, federal courts may exercise inherent powers to award attorney's fees in "narrowly defined circumstances." When an attorney or litigant has demonstrated bad faith in the conduct of litigation, the court has the inherent authority to assess an award of attorney's fees. *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765-66 (1980). If the district court uses its inherent powers to sanction, it must find that the questioned conduct constitutes or is tantamount to bad faith. *Id.* at 767. Attorney's fees have also been awarded

under inherent authority "in the interest of justice" with no finding of bad faith. *Ray A. Scharer and Co., Inc.v. Plabell Rubber Products, Inc.*, 858 F.2d 317, 320 (6th Cir. 1988).

In *First Bank of Marietta*, *supra*, the Sixth Circuit held that a district court has the inherent authority to impose an award of attorney's fees and other sanctions against a party in its discretion, if: (1) the claim asserted by the party was meritless; (2) counsel knew or should have known that the claim was meritless; and (3) the claim was filed for an improper purpose such as harassment or delay. *Id.* at 519-24. "In this Circuit, 'bad faith' is a requirement for the use of the district court's inherent authority, but this Circuit has also upheld the use of such sanctions for conduct that 'was tantamount to bad faith.'" *Id.* at 519. The moving party must prove by clear and convincing evidence that the other party's actions are entirely without color and are motivated by bad faith. *See Shepherd v. American Broadcasting Companies, Inc.*, 62 F.3d 1469, 1477 (D.C. Cir. 1995) ("courts require clear and convincing evidence before imposing attorneys' fees under their inherent power"); *Autorama Corporation v. Stewart*, 802 F.2d 1284, 1287 (10th Cir. 1986) ("it is not surprising that attorneys' fees are awarded only when there is 'clear evidence' that the challenged actions are taken entirely without color and are pursued for reasons of harassment or delay"); *Weinberger v. Kendrick*, 698 F.2d 61, 80 (2nd Cir. 1982) ("We have required . . . that there be 'clear evidence' that the challenged actions 'are entirely without color and [are taken] for reasons of harassment or delay or for other improper purposes."), *cert. denied*, 464 U.S. 818 (1983). Because the Court will impose fees and sanctions under 28 U.S.C. § 1927 and 42 U.S.C. § 1988 in the case at bar, the Court need not consider sanctions pursuant to its inherent powers. *In re Telxon Corp. Securities Litigation*,

58

No. 5:98CV2876, 1:01CV1078, 2004 WL 3192729, at *36 (N.D. Ohio July 16, 2004) (Magistrate Judge recommended that default judgment on liability be entered for violations of Fed. R. Civ. P. 37(c)).

Since the Court does not find bad faith or that the conduct of the plaintiffs and their counsel was "tantamount to bad faith," the Court will not base the award of attorney's fees on its inherent authority. *See Roadway Express*, 447 U.S. at 767; *First Bank of Marietta*, 307 F.3d at 517.  In addition, the statutes are "up to the task" of addressing the offending behavior at issue in the case at bar. *Chambers*, 501 U.S. at 50.

## IV. CONCLUSION

For the foregoing reasons, the Court determines that an award of attorney's fees is appropriate.

Defendants' Motion for Award of Attorney's Fees and Costs under 42 U.S.C. § 1988 (Doc. 246) is GRANTED;

Defendants' Motion for Attorney's Fees and Sanctions for Frivolous Conduct under Ohio Rev. Code § 2323.51 (Doc. 252) is DENIED; and

Defendants' Motion for Attorney's Fees as Sanctions under Rule 11, 28 U.S.C. 1927, and this Court's Inherent Authority (Doc. 263) is GRANTED IN PART.

The Court awards attorney's fees in favor of defendants Joseph F. Russo, Administrative Judge of the Cuyahoga County Juvenile Court;  Kenneth J. Lusnia, Court Administrator; Len Munks, Superintendent; Angelo Lardomita; and Donna Coe, kna Apanasewicz, and against plaintiffs Anthony Garner, Bruce Richardson, Vanessa Brown, Tiffanie Dennis, Shelley Isom, Rayshunn Lilly, Patricia McNear, Monique Moore, Spencer Bellamy, and Thomas Washington pursuant to 42 U.S.C. § 1988

and imposes joint and several liability for that award upon their attorneys, Merrie Frost and Timothy A. Ita, as a sanction pursuant to 28 U.S.C. § 1927. *See Swank v. Thompson*, Case No. 1:98CV2343, slip op. (N.D. Ohio June 14, 2000) , *aff'd*, 25 Fed. Appx. 418 (6th Cir. Feb. 5, 2002).

In summary, no attorney's fees will be awarded due to the inclusion of Janie Carter, Charvez James, Al David, Richard Drost, and Jimmy Dimora as defendants. *See* Notice of Dismissal (Doc. 59) and Stipulation of Dismissal "without costs to either party" (Doc. 83).

Defendants are entitled to attorney's fees for the preparation of motions for summary judgment pertaining to all of the plaintiffs' claims except those of plaintiffs Jenkins, McCollough, Prather, and Wesley and the following claims of plaintiffs Washington, Bellamy, and Moore: "(1) Count III, claims brought under 42 U.S.C. Section 1983; (2) Count V, Retaliation; (3) Count VI, Respondeat Superior; (4) Count VII, Civil Conspiracy; and, (5) Count VIII, Civil Aiding-Abetting." (Stipulation of Partial Dismissal of Claims "without costs to either party" (Doc. 227)).  The Court will also not award attorney's fees related to "the 'Greeley' claim (public policy exception) as to R.C. 4112" of plaintiffs Garner, Richardson, Brown, Dennis, Isom, Lilly, McNear, Moore, Bellamy, and Washington because Attorneys Frost and Ita did not have any opposition to defendants' Motion for Judgment on the Pleadings as to these claims. *See* Doc. 122 at 1.  In addition, the Court will grant the defendants attorney's fees for discovery costs related to the legally groundless claims based on the plaintiffs' litigation tactics.

The Court must now determine the amount of such award. *See Palazzolo v. Benson*, No. 95-1067, 1996 WL 156699, at *4 (6th Cir. April 3, 1996) ("Once the court decides that the

prevailing party is in fact entitled to fees, the court should allow the prevailing party to offer evidence of fees and allow the nonprevailing party to challenge the reasonableness of those fees.").

If it has not already been done, defense counsel shall immediately provide counsel for plaintiffs with a full and complete record of the billable time charged by the separate attorneys and law clerks for the work performed in the case at bar.

Defendants shall serve and file a single supplemental memorandum in support of their applications for an award of attorney's fees on or October 28, 2005.

Plaintiffs shall serve and file one supplemental memorandum in opposition to defendants' applications for an award of attorney's fees, if any, within 21 days after service of the supplemental memorandum in support.

Counsel shall address the following issues in their memoranda:  (1) the reasonable hourly rate[50] and (2) the number of hours actually and reasonably expended on the case.  If plaintiffs object to the number of hours expended on the case, they shall provide a detailed, specific explanation of why a

---

[50]The parties must provide satisfactory evidence, in addition to counsel's own affidavit, that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation. *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984); *Glover v. Johnson*, 934 F.2d 703, 716 (6th Cir. 1991) (suggesting that third-party affidavits should be submitted to establish the prevailing market rate).

particular item of services rendered was not reasonably expended.  The explanation must include a

comprehensive presentation of all factual grounds and legal analysis in a non-conclusory fashion.


IT IS SO ORDERED.


  October 7, 2005                                      */s/ John R. Adams*
Date                                                 John R. Adams
                                                U.S. District Judge